1   NOAH G. BLECHMAN (State Bar No. 197167)
    noah.blechman@mcnamaralaw.com
2   AMY S. ROTHMAN (State Bar No. 308133)
    amy.rothman@mcnamaralaw.com
3   KEREN SCHLANK (State Bar No. 310389)
    keren.schlank@mcnamaralaw.com
4   McNAMARA, NEY, BEATTY, SLATTERY,
    BORGES & AMBACHER LLP
5   3480 Buskirk Avenue, Suite 250
    Pleasant Hill, CA 94523
6   Telephone: (925) 939-5330
    Facsimile:  (925) 939-0203
7
    Attorneys for Defendants
8   CITY OF ANTIOCH; RICK SMITH; CHRIS KIDD; and
    CASEY BROGDEN
9

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12

13

14  C.R., co-successor-in-interest to Decedent          Case No. C16-03742 JST
    Rakeem Rucks, by and through his
15  Guardian Ad Litem Beverly McIntosh; I.R.,           **DEFENDANTS' NOTICE OF MOTION**
    co-successor-in-interest to Decedent                **AND MEMORANDUM OF POINTS AND**
16  Rakeem Rucks, by and through his                    **AUTHORITIES IN SUPPORT OF**
    Guardian Ad Litem Beverly McIntosh;                 **MOTION FOR SUMMARY JUDGMENT**
17  R.R., co-successor-in-interest to Decedent          **OR PARTIAL SUMMARY JUDGMENT**
    Rakeem Rucks, by and through his
18  Guardian Ad Litem Beverly McIntosh; J.R.,           Date:   February 1, 2018
    co-successor-in-interest to Decedent                Time:   2:00 p.m.
19  Rakeem Rucks, by and through her                    Dept:   Ctrm. 9-19th Flr.
    Guardian Ad Litem Jasmine Williams; and             Judge:  Hon. Jon S. Tigar
20  Debra Moore, individually,

21              Plaintiffs,

22      vs.

23  CITY OF ANTIOCH, a municipal
    corporation; RICK SMITH, CHRIS KIDD,
24  CASEY BROGDEN, THOMAS SMITH,
    BRIAN ROSE, individually and in their
25  official capacity as a police officers with
    the CITY OF ANTIOCH; and DOES 1-50,
26  inclusive, individually, jointly and
    severally,
27
                Defendants.
28

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................1

I. INTRODUCTION .......................................................................................1

II. ISSUES PRESENTED .................................................................................2

    A.    Whether the APD Officers *caused* Decedent's death? .........................2

    B.    Whether the APD Officers used excessive force on Decedent in violation of the Fourth Amendment? (If the Court finds the officers here used only reasonable force on Decedent, then the issue as to the "cause" of Decedents' death becomes immaterial.) .........................2

    C.    Whether the individual APD Officers are entitled to qualified immunity? .............2

    D.    Whether Plaintiffs' have any viable claim for violation of their rights to familial relationship in violation of the Fourteenth Amendment? ...........................2

    E.    Whether Plaintiffs' have any viable *Monell* claim(s) against the City of Antioch. .........................2

    F.    Whether Plaintiffs' have any viable related state law claims against the APD Officers for violation of the Bane Act, Negligence, Assault or Battery? .........................2

III. RELEVANT FACTS ...................................................................................2

    A.    Responding to the 911 Call. ...................................................2

    B.    Initial Contact With Decedent ...............................................3

    C.    Decedent's Struggle With Officers. ...........................................4

    D.    Corporal Rick Smith And Officer Tom Smith Arrive On Scene ...........................7

    E.    Coroner's Testimony and Opinion Regarding The Cause of Death ........................9

IV. LEGAL STANDARDS ...............................................................................12

V. LEGAL ARGUMENTS................................................................................13

    A.    Plaintiffs' Fourth Amendment Claim For Excessive Force, Fails. ........................13

        1.    Fourth Amendment Excessive Force Legal Standards ...............................13

        2.    Plaintiffs Have No Evidence Establishing Defendant Officers Caused Decedents' Death. ...................................16

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

3.   Plaintiffs Cannot Establish Through Evidence That the Force Used
     By Officers Here was Unreasonable/Excessive...........................................16

          a.     Ofc. Kidd.......................................................................18

          b.     Ofc. Brogdon.................................................................18

          c.     Cpl. Smith .....................................................................20

     B.   The Defendant Officers Are Entitled to Qualified Immunity ................................21

     C.   Plaintiffs' Fourteenth Amendment Claim For Violation of Plaintiffs'
          Rights To Familial Relationship, Fails. ...........................................22

     D.   Plaintiffs' *Monell* Claim(s), Fails. ...........................................23

     E.   Plaintiffs' Related State Law Claims Also Fail. ...................................24

VI. CONCLUSION...........................................................................25

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ............................................12

*Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ...........................................................21

*Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991) ...........................12

*Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) ...........................14

*Brown v. Ransweiler,* 171 Cal. App. 4th 516, 537-538 (2009)....................................25

*Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) .........................................14

*Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013) ............................................24

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ..............................................12

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ..........................................22

*Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) ..............................22

*Daniels v. Williams*, 474 U.S. 327, 330 (1986) .........................................................22

*Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) ..............................14

*Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) ......................13, 15, 21

*Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir. 1994) ..........................15

*Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994) ............................................14

*Graham v. Connor*, 490 U.S. 386, 395 (1989) ...........................................9, 13, 14, 24

*Gregory v. Cnty of Maui*, 523 F.3d 1103 (9th Cir. 2008) .......................................15, 20

*Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629, 160 (2013) ................................25

*J.P. ex rel. Balderas v. City of Porterville*, 801 F. Supp. 2d 965, 988 (E.D. Cal. 2011)..............22

*Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1168-69 (9th Cir. 2013) ....................23

*Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir. 1988).....................................................16

*Long v. Cty. of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006) .........................................23

*Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 691-92 (1978) ...........1, 23, 24

*Montez v. City of Stockton*, 2017 U.S. Dist. LEXIS 94180, at \*7-9 (E.D. Cal. June 16, 2017)
.................................................................................................................... passim

*Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015).........................21, 22

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

*Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010)................................24

*Pearson v. Callahan*, 555 U.S. 223, 231, (2009) ........................................................21

*Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ...............................................23

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) ........12

*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ...................................................23

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)..........................12

*White v. Pauly*, 580 U.S. ____, 137 S. Ct. 548, 196 L. Ed. 2d 463, 2017 U.S. LEXIS 5, at *9 (Jan. 9, 2017) ................................................................................................21

*Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) ...............................................22

*Yount v. City & Cty. of S.F.*, No. C 11-1141 MEJ, 2013 U.S. Dist. LEXIS 101457, at *20 (N.D. Cal. 2013)................................................................................................22

**Statutes**

42 U.S.C. § 1983 ...........................................................................1, 16, 22, 23, 24

California Civil Code § 52.1 ..........................................................................24

Federal Rule of Civil Procedure 56 ................................................................1, 12

TO PLAINTIFFS / COUNSEL OF RECORD, PLEASE TAKE NOTICE that on February 1, 2018, at 2:00 p.m., in Courtroom 9 (19th Floor) in U.S.D.C. in San Francisco, located at 450 Golden Gate, San Francisco, California, Defendants will and do move for Summary Judgment or Partial Summary Judgment pursuant to Federal Rule of Civil Procedure (FRCP) 56 with respect to all claims brought by Plaintiffs in their Complaint. **Exh. A**, Complaint, ECF-1. Defendants are entitled to judgment as a matter of law as to these causes of action and there are no triable issues of material facts. This Motion is based on this Notice, Memorandum of Points and Authorities, Declaration of Amy S. Rothman, Esq. and attached exhibits (all with Rothman Decl.), and such further evidence and oral argument as may be presented on this matter.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I. INTRODUCTION**

This civil action arises out of a detention incident involving Rakeem Rucks ("Decedent"), which occurred on the afternoon of June 25, 2015, after which Decedent died. On that date, Antioch Police Department ("APD") officers were dispatched to the Delta Pines Apartment complex ("Delta Pines") per a 911 call that people were chasing the male caller, trying to shoot him. Once at Delta Pines, Officers determined Decedent had broken a neighbor's door in a potential break-in. After locating Decedent, who appeared under the influence of methamphetamine, Decedent was lawfully detained in handcuffs so Officers could continue their investigation. As Decedent was being walked to a patrol car, he physically resisted officers and was then taken to the ground and held on the ground for a period of time until he calmed down. After Decedent finally calmed down and stopped struggling, he had a medical issue, could not be revived and died. Ultimately, the coroner found that Decedent died of Excited Delirium when his heart stopped, and ruled out that Decedent died of asphyxiation caused by Defendants.

Plaintiffs have brought several claims, including Federal claims for excessive force in violation of the Fourth Amendment, violation of their Fourteenth Amendment right to familial relationships, and related *Monell* claim(s) pursuant to section 1983. Plaintiffs also bring related state law claims for violation of the Bane Act, Negligence, Assault and Battery. As shown below,

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

Plaintiffs' have absolutely no evidence establishing that the individual Defendant officers *caused* Decedents' death. In addition, Defendant officers used only limited and reasonable force on Decedent. Plaintiffs cannot prove any constitutional claim and if they can set forth an arguable one, the individual Defendants are entitled to qualified immunity. Plaintiffs' *Monell* and state law claims fail as well. Defendants are entitled to judgment as a matter of law, and dismissal of this action with prejudice.

## II. ISSUES PRESENTED

**A. Whether the APD Officers *caused* Decedent's death?**

**B. Whether the APD Officers used excessive force on Decedent in violation of the Fourth Amendment? (If the Court finds the officers here used only reasonable force on Decedent, then the issue as to the "cause" of Decedents' death becomes immaterial.)**

**C. Whether the individual APD Officers are entitled to qualified immunity?**

**D. Whether Plaintiffs' have any viable claim for violation of their rights to familial relationship in violation of the Fourteenth Amendment?**

**E. Whether Plaintiffs' have any viable *Monell* claim(s) against the City of Antioch.**

**F. Whether Plaintiffs' have any viable related state law claims against the APD Officers for violation of the Bane Act, Negligence, Assault or Battery?**

## III. RELEVANT FACTS

### A. Responding to the 911 Call.

Just after noon, on June 25, 2015, Antioch Police Department ("APD") officers were dispatched to the Delta Pines Apartment complex ("Delta Pines") in Antioch due to a 911 call. **Exh. B, Deposition of Ofc. Brogdon**, pgs. 30:7-31:5; **Exh. C, Deposition of Ofc. Kidd**, pg. 39:3-9. Dispatch informed officers that the caller was hysterical and was yelling that five people were chasing after him trying to shoot him. **Exh. B,** pgs. 31:18-32:8; 33:19-23. The call was prioritized as "priority one," the most "urgent type of call," and officers responded to the scene "Code 3," an urgent response with their lights and sirens activated. **Exh. C,** pg. 39:10-23.

Officers Brogdon and Kidd responded to Delta Pines separately. **Exh. B,** pgs. 32:18-33:3. Ofc. Brogdon arrived first and "due to the nature of the call," waited for Ofc. Kidd to arrive

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

before looking for Apt. No. 160, which had been mentioned in the 911 call. **Exh. B,** pg. 33:1-18, **Exh. C**, pg. 41:19-24. At Apt. No. 160, officers observed that the "door jam was broken and the door was open," indicating there had been a forcible entry and possibly a "burglary, or home invasion, or something definitely out of the ordinary." **Exh. C**, pg. 42:23-43:7. Officers could not locate anybody in the apartment, including the owner. **Exh. C**, pgs. 43:12-44:12.

Officers were contacted by a neighbor, Steven Blackwell, who informed them he had seen "a guy named Rakeem was in the complex who appeared to be high off drugs and kicked the man's door in." **Exh. C**, pgs. 44:13-22; 45:12-19. Mr. Blackwell told officers that "Rakeem" (Rakeem Rucks, the Decedent) was the same person who called 911,[1] and that nobody was chasing him; rather he "was just high." **Exh. B,** pg. 34:15-23. Another neighbor told the officers that Decedent uses methamphetamine. **Exh. B,** pg. 37:4-6.

The officers were able to get in touch with Mr. Pernell, the occupant of Apt. No. 160, and he returned to Delta Pines shortly thereafter to speak with officers. **Exh. B**, pgs. 39:11-13; **Exh. C,** pgs. 47:7-48:17. The officers informed Mr. Pernell about their presence at his apartment and Mr. Pernell indicated he believed he knew the Decedent and walked the officers over to another unit in an attempt to locate Decedent. **Exh. B**, pgs. 39:11-40:7; **Exh. D, the Deposition of Pernell,** pg. 20:2-22. During that time, another resident flagged the three men down and pointed towards where Decedent was apparently located. **Exh. C**, 53:8-15.

### B. Initial Contact With Decedent

As the officers and Mr. Pernell walked towards where they had been directed, they heard unintelligible "screaming and yelling." **Exh. C**, pg. 54:17-55:1. The officers saw Decedent at the top of the stairway at another building at Delta Pines, "pounding on another apartment door." **Exh. B**, pg. 41:4-7; **Exh. C**, pg. 54:17-55:1. Mr. Pernell identified the man as Rakeem (Decedent) and Ofc. Kidd immediately recognized Decedent from a prior contact with the APD. **Exh. C**, pg. 55:2-7; **Exh. D**, pgs. 22:18-23:3. Ofc. Kidd relayed to Ofc. Brogdon that he recognized Decedent and believed "that it was imperative that we detain Mr. Rucks" in

---

[1] It was determined after the incident that Decedent, in fact, was the 911 caller that led to officers being dispatched.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

handcuffs. **Exh. C**, pgs. 63:19-64:5. Ofc. Kidd explained to Ofc. Brogdon that in a prior incident with Decedent, he observed an officer get into a foot pursuit with Decedent, where Decedent ultimately attempted to square up and fight with the pursuing officer. **Exh. C**, pgs. 65:21- 66:11.

The officers also noticed several unusual things about Decedent's appearance, including that he was sweating profusely, was acting agitated, "you know furtive movements, as well as talking really fast, hard to understand," and was acting very paranoid. **Exh. B**, pgs. 49:14-50:4; 51:11-18; **Exh. C**, pgs. 59:25-60:11, 76:23-77:11; **Exh. D**, pgs. 34:13-35:8. Based on their training and experience, the officers believed Decedent was under the influence of a controlled substance, possibly methamphetamine. *Id.* Based on the totality of the circumstances, "investigating a home invasion or a burglary or a vandalism, the fact that somebody, who by multiple people, said he was under the influence of a controlled substance, and even my own witnessing of his objective symptoms under the influence of a controlled substance," and Ofc. Kidd's knowledge of Decedent's prior contact with police, the officers believed they needed **to detain** Decedent in handcuffs for officer safety purposes, before further investigating this 911 call and the break-in. **Exh. B**, pgs. 52:11-53:22; **Exh. C,** pgs. 67:10-68:17; 74:9-18.

The officers requested that Decedent come down the stairs to speak with them, and Decedent complied. **Exh. B**, pg. 52:1-7; **Exh. C**, pg. 59:19-24; **Exh. D**, pg. 25:3-8. The plan at that time was to get Decedent detained in Ofc. Brogdon's patrol vehicle so the officers could safely continue their investigation. **Exh. B**, pg. 58:9-12. As Mr. Pernell stated, "one of the officers said we're not going to do nothing to hurt you, we just want to talk to you and put the handcuffs on you so we can talk to you." **Exh. D**, pg. 25:13-16. Ofc. Brogdon handcuffed Decedent, which was slightly difficult due to Decedents' continued movement. **Exh. B**, pgs. 54:22-55:10. At this point, officers began to walk Decedent towards their patrol vehicles. **Exh. B**, pg. 64:7-10; **Exh. D**, pgs. 27:18-28:1.

C. **Decedent's Struggle With Officers.**

After placing Decedent in handcuffs and walking about twenty feet, Decedent began physically and verbally resisting the officers, attempting to stop and turn to face the officers. **Exh. B**, pg. 64:3-66:16; **Exh. C**, pgs. 79:23-80:9; **Exh. D**, pgs. 29:25-30:8. Decedent began

1  aggressively pulling himself away from the officers, trying to face them. *Id.* **As Mr. Pernell**

2  **testified, "he was wiggling. He was moving his shoulders and turning them around" and it**

3  **was clear the officers could not control him**. **Exh. D**, pg. 30:9-17.

4  Due to this resistance, both officers independently decided that they needed to take

5  Decedent to the ground to better control him for officer safety purposes. **Exh. B**, pgs. 63:15-64:2;

6  **Exh. C**, pgs. 80:11-19; 83:4-7. Ofc. Brogdon attempted to pull Decedent to the ground by his

7  arm, but was unsuccessful due to Decedent's resistance. **Exh. B**, pg. 67:14-18. Ofc. Kidd

8  observed Ofc. Brogdon's struggle and decided he needed to assist. **Exh. C**, pg. 83:11-16. Ofc.

9  Brogdon "grabbed him around his shoulder area and tried pulling him to the ground. And about

10  the same time, officer Kidd was doing some type of like a leg sweep maneuver to also assist in

11  getting Mr. Rucks to the ground." **Exh. B**, pg. 67:17-23; **Exh. C**, pgs. 85:15-86:4; **Exh. D**, pg.

12  30:14-17. **As Mr. Pernell testified, Decedent had become increasingly agitated at that time,**

13  **"it just seemed like it was building up to be something," and "I think if the officer hadn't**

14  **have done the leg sweep they would have had a problem."** **Exh. D**, pg. 84:1-5.

15  Decedent fell to the ground on his side, onto a grass and dirt area, but Decedent continued

16  to move. **Exh. B**, pg. 69:11-20, 70:5-13; **Exh. C**, pg. 87:11-19. Decedent continued to yell and

17  grunt, but officers could not tell what he was saying. **Exh. C**, pg. 88:19-24. Within a few

18  seconds, officers were able to position Decedent on his stomach. **Exh. B**, pg. 71:2-8. Even on

19  his stomach, Decedent continued to struggle, "violently trying to get up, kicking, moving around

20  a lot." **Exh. B**, pgs. 71:14-72:19. Ofc. Brogdon positioned himself at Decedent's left shoulder

21  "just holding him down, putting some pressure on his left shoulder to keep him – keep him down,

22  keep him from getting up." Ofc. Brogdon was using his weight from his arms and hands to hold

23  Decedent's left shoulder down, although he may have also used his knee and possibly a foot to do

24  so at some point, but does not specifically recall as the Decedent was vigorously moving around

25  at that time. **Exh. B**, pgs. 72:11-75:23. Ofc. Kidd positioned himself at Decedents' feet since

26  Decedent's "legs were going wild," and Decedent "wouldn't obey commands to stop resisting

27  and relax." **Exh. C**, pg. 89:11-17.

28  At some point during the struggle both Ofc. Kidd and Ofc. Brogdon recall **that Decedent**

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

**began attempting to grab at Ofc. Kidds' duty belt which contained his weapons**. **Exh. B**, pg. 73:1-8; **Exh. C**, pgs. 92:13-93:1. Observing this, Ofc. Brogdon helped Ofc. Kidd by reaching for either Decedent's hands or handcuffs, and pulling them a couple inches towards him and away from Ofc. Kidd's duty belt, but did not pull them vertically up to the sky. **Exh. B**, pg. 76:2-77:23. After much effort, Ofc. Kidd was eventually able to place Decedent's legs in a figure four leg lock, a trained leg hold. **Exh. C**, pg. 93:13-94:12. While holding Decedent in the leg-lock, only a portion of Ofc. Kidd's body weight was on Decedent's legs so they could not get free. **Exh. C**, pg. 94:22-95:5.

As Decedent appeared to be under the influence of drugs, Ofc. Kidd was rubbing Decedent's back, trying to calm him down, he was talking to Decedent, telling him to relax and letting Decedent know that they were not going to hurt him, but Decedent would not calm down. **Exh. C**, pgs. 91:18-92:8. **Mr. Pernell, testified that both officers and random bystanders were telling Decedent to calm down and that the officers were not going to hurt him**. **Exh. D**, pgs. 37:21-38:9. Mr. Pernell testified "I told him [Decedent] they're not going to hurt you, they're not doing nothing wrong to you. Just lay still." **Exh. D**, pg. 38:5-9. Per Mr. Pernell, the officers were trying to calm Decedent down throughout the interaction even "in the beginning, after they put the handcuffs on him and they were walking with him." **Exh. D**, pg. 40:2-11.

Although Ofc. Brogdon does not specifically recall using his knee or foot to help subdue Decedent's upper body, witness Mr. Pernell testified that during the time Ofc. Kidd was attempting to control Decedent's legs in a leg-lock, Ofc. Brogdon's knee was on Decedent's jaw. **Exh. D**, pg. 26:12-16. Mr. Pernell explained, "the smaller officer was up leaning down on him with his knee to his jaw, to his neck, because the guy was fidgeting," and was "very sporadic, moving around." **Exh. D**, pg. 33:7-19. Per Mr. Pernell, the knee was positioned on the side of Decedent's face meaning the opposite side of Decedent's face was on the ground (Decedent's face was not directly face down on ground). **Exh. D**, pgs. 45:22-47:2. He further explained that when Ofc. Brogdon's knee initially made contact with Decedents' cheek, Decedent was moving sporadically, and it [Ofc. Brogdon's knee] started slipping back and forth. He had to raise it [his knee] back up to put it back on his [Decedent's] jaw." **Exh. D**, pgs. 44:21-45:5. Decedent "was

just agitated, moving around," and "the officer's knee [Brogdon] was going from his [Decedent's] jaw to his neck, from the jaw to his neck. It kept moving." **Exh. D**, pg. 26:12-16.

Mr. Pernell explained that Ofc. Brogdon was smaller and "the young kid had his work cut out for him" and "was doing all he could to keep that gentleman down." **Exh. D**, pg. 47:8-48:5 Mr. Pernell explained that if Decedent was able to get up, both of the officers "would have been in trouble." **Exh. D**, pg. 45:11-21. Mr. Pernell testified that Ofc. Brogdon's knee was not positioned on Decedents' neck for an extended period of time rather the knee was constantly moving back and forth between the side of Decedents' face and sliding down towards Decedents' neck due to Decedent's own movement, before it would be repositioned on the side of Decedent's face. **Exh. D**, pgs. 48:15-49:11.

**D.** **Corporal Rick Smith And Officer Tom Smith Arrive On Scene**

During the struggle, Code 3 urgent assistance was requested at the scene and Cpl. Rick Smith responded quickly as he heard the "urgency" in the officers' voices. **Exh. E, Deposition of Cpl. Smith**, pgs. 52:22-53:8; 54:1-10. After parking his vehicle, Cpl. Smith looked over and saw Officers Kidd and Brogdon actively struggling with Decedent. **Exh. E**, pg. 55:19-24. Cpl. Smith realized the two needed a WRAP (body restraint) device so he directed Ofc. Tom Smith to report to the scene Code 3 with a WRAP device. **Exh. E**, pgs. 56:19-57:1. Cpl. Smith then ran to assist officers Kidd and Brogdon. Id. At that time, Ofc. Kidd had Decedent in a figure-four leg-hold, but Decedent was "able to lift him up in the air off that hold," while he also saw Ofc. Brogdon on the left side of Decedent, holding Decedent down by Decedent's left shoulder blade of his back. **Exh. E**, pg. 58:2-14.

Cpl. Smith recognized that Ofc. Brogdon was "kneeling" off to the left side of Decedent, applying a known control hold which requires "bringing the wrist up slightly, not off the body but just pushing the wrist upward. . . towards his head." **Exh. E**, pgs. 60:1-12; 62:12-17. At the same time, Ofc. Brogdon was pushing down onto Decedent's left shoulder, to keep Decedent from bucking up or arching his body upward. **Exh. E**, pg. 60:13-17. Cpl. Smith positioned himself in the same manner as Ofc. Brogdon, on the other side of Decedent's upper body, using "light pressure on Decedent's shoulder using his hand and arm only, while simultaneously

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1    attempting to use "verbal judo" to get a rapport with Decedent and calm him down. **Exh. E**, pgs.

2    67:15-68:24.

3         Cpl. Smith knelt his head forward during the struggle toward Decedent's face in an

4    attempt to establish eye contact with him and maintain a rapport, which has worked in calming

5    suspects down in the past. **Exh. E**, pg. 69:3-10. At that time, Decedent began to "dramatically"

6    calm down. **Exh. E**, pg. 69:11-13. Due to the heat that day and the struggle, Cpl. Smith had

7    already called for "Code 2 medical," requesting that an ambulance and fire department respond to

8    the scene and stage nearby. **Exh. E**, pgs. 69:18-70:3. **Mr. Pernell testified that at some point**

9    **he heard Decedent state that it was hard for him to breath, but he could still see that**

10   **Decedent was breathing, since he could see that the side of Decedents' face was positioned**

11   **on the ground and dust was being blown as Decedent "breathed out."** **Exh. D**, pgs. 95:4-

12   97:9. None of the officers heard Decedent state that he was having difficulty breathing at that

13   time. **Exh. B**, pg. 87:5-8, **Exh. C**, pg. 108:18-21, **Exh. E**, pg. 115:8-12.

14        Cpl. Smith explained that he had called for Code 2 medical due to his training on Excited

15   Delirium. **Exh. E**, pgs. 70:4-71:1. Cpl. Smith noted signs of Excited Delirium, including

16   Decedent's lack of response, the fact that he was a larger guy and had been in a struggle over a

17   period of time in "high heat," paired with the fact that he appeared to be acting like someone

18   under the influence of a narcotic. *Id.* While conversing with Decedent, Cpl. Smith began to

19   notice that "he's not making eye contact anymore, he's not making the grunts, **but he's still**

20   **breathing**. So at that point in time, I believe I got on the radio and advised them [medical] to go

21   Code 3 and directly respond in." **Exh. E**, pgs. 72:3-22. Cpl. Smith testified that Decedent's

22   breathing was no different than anyone else who was involved in a struggle. *Id.*, pgs. 73:14-74:7.

23        At this point, Ofc. Smith[2] arrived on scene with a WRAP device. **Exh. F, Deposition of**

24   **Ofc. Tom Smith**, pg. 18:1-16. After placing Decedent in the leg portion of the WRAP, Ofc.

25   Smith recalls Cpl. Smith mentioning something about Decedent "possibly suffering from some

26   sort of medical emergency." **Exh. F**, pg. 27:21-28:2. At that time, Cpl. Smith directed the

27

28   _____
     [2] Ofc. Tom Smith has previously been dismissed, with prejudice, from this action. Cpl. Rick Smith is still a party.

officers to roll Decedent over and he checked for a carotid pulse, but did not find a pulse. **Exh. E**, pg. 75:12-16. Cpl. Smith then checked Decedent's "brachial" as he is trained to do and then did a sternum rub to see if Decedent would react, but Decedent did not react. **Exh. E**, pg. 75:17-76:1. Cpl. Smith directed Ofc. Brogdon to begin chest compressions on Decedent. **Exh. E**, pg. 76:4-9. Medical personnel responded immediately from the staged area and Cpl. Smith informed them that Decedent had "coded out." **Exh. E**, 76:10-17; **Exh. F**, pg. 28:2-7.

Cpl. Smith testified that during the time he was at the scene, including the time in which he was leaning over, face-to-face with Decedent, Decedent was observed to be breathing until he became unresponsive. **Exh. E**, pgs. 81:11-82:3. Cpl. Smith testified that Ofc. Brogdon did not have his knee or foot on Decedents' cheek or neck at the time he was face-to-face with Decedent, and noticed a medical emergency. **Exh. E**, pgs. 81:9-82:13. Officers Brogdon and Kidd testified that they did not punch Decedent or use any of their weapons such as their baton, or flashlight to strike Decedent, nor did they use a Taser to subdue him, as corroborated by Mr. Pernell. **Exh. B**, pg. 91:21-25; **Exh. C**, pg. 98:3-10; **Exh. D**, pg. 41:3-18.

Officers acted reasonably throughout their contact with Decedent in this action and used only the limited amount of force needed to take Decedent to the ground and keep him on the ground, until Decedent's physical resistance stopped. As Mr. Pernell stated in his deposition, **"Bottom line, what it was to me they didn't want him to get up because he was more than a handful. He would have got 'em even with the handcuffs on. He would have got 'em. . . If he wasn't in handcuffs the wouldn't have been able to control that young man. There's no way."** Exh. D, pg. 34:2-12. Decedent was breathing until he had a medical emergency, which was determined to be that his heart stopped due to the struggle and his methamphetamine intoxication, as seen below.

All individual officers here, acted in compliance with the APD use of force policy, which comports with the *Graham* standards. **Exh. H, Use of Force Policy**.

E.     **Coroner's Testimony and Opinion Regarding The Cause of Death**

Forensic Pathologist, Dr. Arnold Josselson, performed the autopsy on Decedent on June 29, 2015, four days after Decedent's death on June 25, 2015. **Exh. G, Deposition of Dr.**

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

**Josselson**, pgs, 7:15-17, 10:21-11:11. Dr. Josselson ultimately found **that Decedent's cause of death was "cardiopulmonary arrest while in a struggle with officers while under the influence of methamphetamine," also known as "Excited Delirium."** **Exh. G**, pgs. 29:13-30:22. As Dr. Josselson explained, Decedent did not have a heart attack, rather "his heart stopped beating and he stopped breathing while he was in a struggle with the officers while he was under the influence of methamphetamine." *Id.*, pgs. 29:19-30:2. Dr. Josselson defined Excited Delirium as follows:

> "A syndrome which involves death of someone while in a struggle, usually while in a struggle with police officers while they're under the influence of meth – of drugs. Usually it's cocaine or methamphetamine. But I've had cases and there are cases described where people aren't on drugs. And usually these are males. They're usually - - I believe the average age is 36. They often will have an enlarged heart, as he does.
>
> And it's important that there's no other cause of death that we find. They usually exhibit a very aggressive bizarre behavior. They usually sweat heavily, as he did. They can have hallucinations. I don't know if he did or not. But I believe he thought people were trying to shoot him, which I don't believe actually happened. . . usually it's warm weather. And I believe it was rather warm. This was June."

*Id.*, 30:23-32:11.

Dr. Josselson testified that in this case, Decedent "had a typical age, sex, use of drugs, he had typical symptoms and behavior that are associated with the syndrome," including aggressiveness and hallucinations, the weather was warm outside, Decedent was sweating profusely, he was male, he was 34 years old, and he had an enlarged heart at the time he engaged in a struggle with officers. *Id.*, pgs. 32:15-34:2; 71:25-72:7. Additionally, 340 nanograms per milliliter of methamphetamine was found in Decedent's body, a significant amount, as well as 37 nanograms per milliliter of amphetamines. *Id.*, pgs. 17:7-16, 18:15-19. Due to these facts, and the fact that Dr. Josselson found no other cause of death, Dr. Josselson found that Decedent here died of Excited Delirium syndrome. *Id.*, pg. 31:9-11.

In terms of ruling out other possible causes of death, Dr. Josselson testified that he performed a microscopic examination of Decedent's organs to see if there could be a cause of

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

death there, which there was not. *Id.*, pg. 36:10-20. Dr. Josselson also found that none of the abrasions or contusions on Decedent caused his death, regardless of how they were sustained. *Id.*, pg. 39:4-12. Per an internal examination of Decedents' neck/throat, no "abnormalities in the anterior strap muscles, hyoid bone, laryngeal cartilages or cervical vertebral column," were found meaning there were no injuries to Decedent's neck/throat. *Id.*, pgs. 39:24-40:14. This also ruled out cause of death by strangulation or an improper carotid hold by officers. *Id.*.

When Plaintiffs' counsel asked Dr. Josselson whether he ever considered "positional asphyxia" as the possible cause of death in this case, Dr. Josselson replied that he did consider it, but found no evidence of that in Decedent. *Id.*, pgs. 40:15-41:10. Dr. Josselson also explained "I think it's been, in my opinion, shown in the literature that that [placing body weight on someone in the prone position] does not play a role in these deaths, even if people are on the person's back. I don't - - I do not think that played a role in this death." *Id.*, pgs. 40:15-41:10.

More specifically, Dr. Josselson explained that he looked for, and found no evidence of petechia hemorrhages in the eyes, which would signal potential asphyxiation (and positional asphyxia). *Id.*, pgs. 41:24-42:19. He found no sort of "chest injury that prevented him [Decedent] from breathing." *Id.*, pgs. 84:24-85:10. Dr. Josselson found "no blockage of the tracheobronchial tree" and found no dirt or debris in either Decedent's nose or mouth which could have caused him to choke or stop breathing. *Id.*, pgs. 54:16-22, 55:14-25. Dr. Josselson noted that although Decedent suffered from asthma, he ruled out asthma as the cause of death. *Id.*, pgs. 54:23-55:6. Dr. Josselson found that Decedents' tongue, esophagus, stomach, small intestine, and colon were unremarkable, and that Rucks' stomach was empty (also showing he did not choke on dirt). *Id.*, pgs. 55:7-13; 61:14-62:3.

Ultimately, Dr. Josselson opined several times that he has "seen nothing that indicates his breathing was impeded," during the struggle which would have caused Decedent's death and there was no evidence of any asphyxia. *Id.*, pgs. 76:21-25, 77:10-21, 79:6-13. Dr. Josselson testified that it is "not uncharacteristic of people that die of this excited delirium to complain of I can't breathe." *Id.*, pg. 80:20-25. This is because "once he had his cardiopulmonary arrest, he obviously had difficulty breathing." *Id.*, pg. 79:6-13. Furthermore, Dr. Josselson confirmed that

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1   when a person says they cannot breathe, that is evidence that the person is actually breathing. *Id.*,

2   pgs. 81:21-82:5. In sum, Decedent died from Excited Delerium which stopped his heart and did

3   not die due to any actions of the officers, nor is there any evidence that Decedent died from being

4   asphyxiated by officers.

## IV. LEGAL STANDARDS

6       Summary judgment is properly granted when no genuine disputed issues of material fact

7   remain, and when, viewing the evidence most favorably to the non-moving party, the movant is

8   clearly entitled to prevail as a matter of law. FRCP 56; *Celotex Corp. v. Catrett*, 477 U.S. 317,

9   322-23 (1986). A "genuine" issue of material fact exists if there is sufficient evidence for a

10  reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477

11  U.S. 242, 248 (1986). A fact is "material" if it is relevant to an element of a claim or a defense,

12  the existence of which may affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. Pacific Elec.*

13  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Uncorroborated allegations and "self-

14  serving testimony" do not create a genuine issue of material fact. *Villiarimo v. Aloha Island Air,*

15  *Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). The non-moving party must set forth "**significant**

16  **probative evidence** tending to support the complaint." *T.W. Elec.*, 809 F.2d at 630-631.

17  (emphasis added).

18      Here, the moving party may discharge its burden of showing that no genuine issue of

19  material fact remains by demonstrating that "there is an absence of evidence to support the non-

20  moving party's case." *Celotex*, 477 U.S. at 325. A complete failure of proof concerning an

21  essential element of the non-moving party's case necessarily renders all other facts immaterial.

22  *Celotex*, 477 U.S. at 323. If the moving party shows an absence of evidence to support the non-

23  moving party's case, the burden shifts to the opposing party to produce "specific evidence,

24  through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v.*

25  *NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). This requires more than the "mere

26  existence of a scintilla of evidence in support of the plaintiff's position," there must be "evidence

27  on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "The more

28  implausible the claim or defense asserted by the non-moving party, the more persuasive its

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

evidence must be to avoid summary judgment." *Id.*

## V. LEGAL ARGUMENTS

### A. Plaintiffs' Fourth Amendment Claim For Excessive Force, Fails.

Here, Plaintiffs' Fourth Amendment Claim (and thus the rest of Plaintiffs' claims) fail(s) for two reasons: (1) Plaintiffs' have absolutely no evidence establishing the Defendant Officers here _caused_ Decedent's death; and (2) Regardless of the *cause* of death, the undisputed facts here establish that the Defendant Officers acted reasonable under the circumstances, meaning there was no constitutional violation and they are entitled to qualified immunity.

It should be highlighted that although Defendants are arguing that Plaintiffs' have no evidence supporting their contention that Defendant Officers here caused Decedent's death, any dispute over the cause of Decedents' death here is really immaterial since Plaintiffs' cannot establish that officers here acted objectively unreasonably. As such, even if there is a genuine dispute regarding whether the Decedent here died of "positional asphyxia" as Plaintiffs' will try to claim, or "excited delirium" as Defendants' experts and the Coroner determined, such dispute would not bar this Court from granting Defendants' Motion in its entirety, simply on the basis here that under the law, these Defendant officers acted objectively reasonable.

#### 1. Fourth Amendment Excessive Force Legal Standards

As will be shown below, Officers here used only the amount of force reasonably necessary to control and detain Decedent, in response to Decedent's own escalating physical resistance, as corroborated by the neutral, third party witness, Mr. Pernell. The force used here by officers was limited to taking Decedent to the ground verbal commands, and pressure put on Decedent's upper shoulders and lower legs to keep Decedent to the ground. It is undisputed that officers never struck, punched, kneed, elbowed, Tased, batoned or used any other type of force on Decedent, besides verbal communication and limited body pressure.

The Fourth Amendment establishes "[t]he right of the people to be secure in their persons . . . , against unreasonable . . . seizures, shall not be violated." U.S. Const. amend. IV. Excessive force claims are analyzed under the Fourth Amendment's "objective reasonableness" standard.

*Graham v. Connor*, 490 U.S. 386, 395 (1989); *Drummond v. City of Anaheim*, 343 F.3d 1052,

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1056 (9th Cir. 2003). The crucial inquiry in excessive force cases is whether the force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397; *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007).

Calculating the reasonableness of the force used "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing interests at stake." *Graham*, 490 U.S. at 396. The court "first assess[es] the quantum of force used" then "measure[s] the governmental interests at stake by evaluating a range of factors." *Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007). In *Graham*, the Supreme Court listed several factors to be considered in assessing reasonableness. *Graham,* 490 U.S. at 396. However, the overall reasonableness calculus is not limited to these factors. "Rather, [the court] examine[s] the totality of the circumstances and consider[s] 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010), quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). Furthermore, reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

On June 16, 2017, the Eastern District of California granted Defendants' Motion for Summary Judgment, in a similar action. *Montez v. City of Stockton*, No. 2:10-cv-03149-MCE-EFB, 2017 U.S. Dist. LEXIS 94180, at *7-9 (E.D. Cal. June 16, 2017). The facts in *Montez* were as follows:

> The officers note that they initially attempted to bring Garcia under control by leaning him against the trunk of the police car, but that this was unsuccessful. While waiting for the arrival of a Safe WRAP device, Garcia continued to resist, pushing the officers away from the car. It was only then that the officers decided to bring Garcia to the ground, which was done in a controlled manner. Garcia resisted even while on the ground, managing to knock Marquez to the ground. Marquez then grabbed Garcia's legs while McDermott placed his knee on Garcia's shoulder without pressing his full weight against Garcia. The struggle as a whole lasted less than two minutes before Garcia went limp and the officers began performing CPR.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

*Montez,* 2017 U.S. Dist. LEXIS 94180, at \*9. Plaintiffs argued that "[t]he actual dispute is whether the Defendant Officers' action caused Mr. Garcia to asphyxiate to death." *Id.* In *Montez,* as in this action, "The medical examiner performed an autopsy on Garcia, and determined the cause of death to be cardiac arrhythmia brought on by hypertrophic cardiomyopathy." *Id.* at \*9-10.

The Eastern District noted that *Montez* was similar to one of the governing cases on these types of cases, *Gregory v. Cnty of Maui,* 523 F.3d 1103 (9th Cir. 2008). *Montez,* 2017 U.S. Dist. LEXIS 94180, at \*11. In *Gregory,* the Ninth Circuit explained and held that:

> The officers did not immediately engage in a physical confrontation with Gregory. Rather, they first asked him to drop the pen. Only after Gregory repeatedly and expressly refused to comply did they attempt to disarm him, and they only sought to restrain Gregory once he resisted. There is no showing that the officers ever struck Gregory, or that they drew or used a weapon. *See Arpin,* 261 F.3d at 922 (holding that officers did not use excessive force in "using physical force to handcuff" an unarmed suspect who resisted by stiffening her arm).
>
> Accordingly, although the confrontation came to a tragic end, we must conclude that the officers did not use excessive force. The severity of Gregory's trespass and of the threat he posed were not overwhelming, but we are satisfied that the force used by the officers was proportionate to both. The Fourth Amendment does not require more. *See Forrester v. City of San Diego,* 25 F.3d 804, 807-08 (9th Cir. 1994) (**HN4** "Police officers . . . are not required to use the least intrusive degree of force possible . . . [T]he inquiry is whether the force that was used to effect a particular seizure was reasonable.").

*Gregory,* 523 F.3d at 1107.

The *Montez* Court rejected the Plaintiffs' argument that the case was more equivalent to *Drummond v. City of Anaheim,* 343 F.3d 1052 (9th Cir. 2003). The *Montez* Court explained:

> In Drummond, the Ninth Circuit found two police officers violated the Fourth Amendment when they both pressed their weight against a "compliant, prone, and handcuffed individual['s]" neck and torso as he made "pleas for air." 343 F.3d at 1059. Here, Garcia was not compliant, but actively resisting the officers, managing to knock one of them to the ground during the struggle. The officers also did not put their full weight against Garcia.

*Montez,* 2017 U.S. Dist. LEXIS 94180, at \*11. Ultimately, the *Montez* Court held that "[t]hough the encounter tragically resulted in Garcia's death, it cannot be said that Defendants used

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

excessive force based on the evidence before the Court." *Id.*

**2.** **Plaintiffs Have No Evidence Establishing Defendant Officers Caused Decedents' Death.**

"A person deprives another of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which the plaintiff complaints." *Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir. 1988). Both cause-in-fact and proximate cause must be shown. *Id.*

Here, as opined by Dr. Josselson, the Forensic Pathologist who conducted the autopsy of the Decedent, the evidence illustrates that Decedent died of "cardiopulmonary arrest while in a struggle with officers while under the influence of methamphetamine," also known as "Excited Delirium." **Exh. G**, pgs. 29:13-30:22. According to Dr. Josselson, Decedents' Excited Delirium was caused by a combination of Decedents' weight, his enlarged heart, the amount of methamphetamine he consumed, the heat outside on the day of his arrest, and the fact that he got into a struggle, in this case, with police officers. *Id.*, pgs. 30:23-11, 32:15-34:2; 71:25-72:7. Importantly, Dr. Josselson found no other cause of death here besides Excited Delirium, and testified that there was absolutely no evidence that Decedent in this case died of "positional asphyxia" or any asphyxia caused by Defendant officers. *Id.*, pgs. 40:23-42:19; 84:24-85:10.

Plaintiffs' inability to prove, through admissible and plausible evidence, that Defendants' caused Decedent's death, is fatal to their Fourth Amendment claim as well as their entire Complaint. As such, all Defendants here are entitled to judgment as a matter of law and dismissal of this action.

**3.** **Plaintiffs Cannot Establish Through Evidence That the Force Used By Officers Here was Unreasonable/Excessive.**

As explained above, even if we were to assume, as Plaintiffs allege without proving, that Decedent died of asphyxia caused by the officers, such is immaterial since Defendants have shown, through undisputed facts that Defendant officers here all acted objectively reasonably. Just as in *Montez,* although Decedent's death here was tragic, officers here used only a take down on the dirt and some limited pressure to hold Decedent to the ground and counter his active

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1    resistance on the ground.  As such, here, as in *Montez,* whether or not officers, through their use

2    of reasonable force, caused Decedent's death is not a disputed question of *material* fact.

3        Here, it is undisputed that Defendant officers were responding to a 911 call (found to be

4    made by Decedent) that armed men were chasing him and attempting to shoot him.  Upon arrival

5    at the complex, officers observed that the door to Apt. No. 160 had been kicked-in; witnesses told

6    them Decedent had been responsible, that people were not chasing him, but he was just high on

7    methamphetamine.  When officers finally located Decedent, he was observed to be "pounding"

8    on another apartment door in the complex and appeared to officers to be under the influence of

9    drugs.  The officers also had prior information about Decedent, namely that in the past, he has

10   attempted to flee and fight with arresting officers.

11       Regardless of these facts, Officers Brogdon and Kidd used verbal commands to get

12   Decedent to come down the stairs and allow himself to be handcuffed without incident.[3]

13   Although Decedent complied in descending the stairs and submitting to being handcuffed, he

14   began verbally and physically resisting the officers before they were able to get him safely

15   secured in a patrol vehicle, to conduct a further investigation into what had transpired at Apt. No.

16   160 and Decedent's level of impairment.  As officers escorted the handcuffed Decedent, as

17   testified to by neutral, third-party witness, Mr. Pernell, Decedent **"was wiggling.  He was**

18   **moving his shoulders and turning them around" and it was clear the officers could not**

19   **control him**.  **Exh. D**, pg. 30:9-17.  As Mr. Pernell continued, **it just seemed like it was**

20   **building up to be something," and "I think if the officer hadn't have done the leg sweep they**

21   **would have had a problem."**  *Id*., pg. 84:1-5.  Even before the leg sweep, Ofc. Brogdon

22   attempted to simply pull Decedent to the ground by his arm, which was unsuccessful due to

23   Decedent's actions.  It was not until Ofc. Kidd observed that Ofc. Brogdon needed assistance that

24   Ofc. Kidd stepped in and conducted a necessary leg sweep on Decedent, taking him down to the

25   grass and dirt.  **Exh. B**, pg. 67:14-23; **Exh. C**, pgs. 85:15-86:4; **Exh. D**, 30:14-17.

26

27   [3] It should be noted that it does not appear Plaintiffs' are now contesting the right of officers to detain and handcuff
     Decedent, per reasonable suspicion to believe he may have committed a crime or be on drugs, as during the recent
28   deposition of Plaintiffs' Police Procedures expert, Mr. Roger Clark, Mr. Clark conceded that it was appropriate for
     officers to handcuff and detain Decedent at this time.  The transcript for this deposition is not yet available.

Once on the ground, even though Decedent was handcuffed, he continued to physically resist the officers' attempts to control him. There was absolutely no point during this struggle when Decedent became at all compliant to the officers' commands. In fact, Decedent's physical resistance increased throughout this struggle.

### a. Ofc. Kidd

The force here used by Ofc. Kidd on Decedent was essentially limited to: (1) the leg sweep take down, (2) his attempts to get Decedent into a leg-lock, and (3) ultimately attempting to maintain control of Decedent's legs in that leg-lock. As the facts above establish, throughout the time that the above described force was used on Decedent, Decedent was vigorously and aggressively resisting the officers to control him. As testified to by Ofc. Kidd, he used only a portion of his body weight applied to Decedent's legs, which were vigorously kicking at the officer (and lifting Ofc. Kidd's body into the air with his leg per Cpl. Smith), in an attempt to get Decedent's legs controlled in a leg lock, while also dodging Decedent's attempts to grab at his duty belt. Furthermore, Ofc. Kidd was also telling him to relax, he was "rubbing his [Decedent's] back, trying to calm him down," which had worked for Ofc. Kidd in other situations. **Exh. C**, pgs. 91:18-92:8. This was corroborated by Mr. Pernell who testified that both he, the officers, and random other bystanders were telling Decedent to calm down and that the police were not going to hurt him. **Exh. D**, pgs. 37:21-38:9. There are absolutely no facts in the record which establish that Ofc. Kidd used anything but reasonable and limited force on Decedent throughout this incident. There are also absolutely not facts (or evidence) establishing that anything Ofc. Kidd did, asphyxiated Decedent or caused his death in anyway. As such, Ofc. Kidd is entitled to judgment as a matter of law as to Plaintiffs' Fourth Amendment claim (and the related state law claims), and dismissal from this action.

### b. Ofc. Brogdon

The force here used by Ofc. Brogdon is essentially limited to: (1) pulling at Decedent's arm and shoulder in order to take him to the ground (which was unsuccessful); (2) using limited body weight of his hands and arms to attempt to hold Decedent's left shoulder down; and (3) moving Decedent's handcuffed hands towards him and away from Ofc. Kidd's duty belt.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1   Additionally, in the vigorous struggle to keep Decedent down, Ofc. Brogdon's knee or body may

2   also have put temporary and/or intermittent pressure down on Decedent's jaw, head and/or neck.

3   Each limited use of force by Ofc. Brogdon was justified and reasonable in response to Decedent's

4   escalating violence and physical resistance, as corroborated by Mr. Pernell, the neutral witness.

5       In terms of pulling Decedent to the ground, we have already established that officers here

6   knew about Decedent's history of fleeing from and resisting arrest, believed that Decedent was

7   under the influence of methamphetamine and was acting irrationally.  At the time officers were

8   walking Decedent to their vehicle, even though handcuffed, he became physically resistant,

9   stopping and attempting to turn and face the officers, and pulling away from them.  Additionally,

10  there is the testimony by Mr. Pernell that the struggle by Decedent was building up to something

11  and "if the officer hadn't have done the leg sweep they would have had a problem." **Exh. D,** pg.

12  84:1-5.  Ofc. Brogdon's attempts to simply pull Decedent to the ground was unsuccessful so Ofc.

13  Kidd needed to assist via the leg sweep.  Ofc. Brogdon's part in Decedent's initial take down was

14  limited and objectively reasonable.

15      Once on the ground, Ofc. Brogdon was using body weight limited to his arms and hands

16  to hold the left portion of Decedent's shoulder down on the ground.  Per Cpl. Smith's testimony,

17  this was appropriate to keep Decedent from "bucking up or arching his body upward." **Exh. E**,

18  pg. 40:13-17.   Decedent's movements were so vigorous that at one point, both Ofc. Brogdon and

19  Ofc. Kidd testified that Decedent, even though he was handcuffed, began grabbing at Ofc. Kidd's

20  duty belt.  In response, Ofc. Brogdon removed his hands from Decedents' shoulder in order to

21  move Decedent's handcuffed hands away a couple of inches from Ofc. Kidd's duty belt.  Clearly

22  the limited force used here to keep Decedent from raising up and keep him away from Ofc.

23  Kidd's duty belt was objectively reasonable as well.

24      Additionally, even if Ofc. Brogdon was using his knee to Decedent's jaw or neck, per Mr.

25  Pernell, this was because Decedent was fidgeting and moving around. **Exh. D**, pg. 33:7-19 As

26  Mr. Pernell testified, the knee was positioned on the side of Decedent's face meaning the opposite

27  side of Decedents' face was on the ground (Decedent did not have his face directly down on the

28  ground (nose down). *Id.,* pgs. 45:22-47:2.  Mr. Pernell testified that even when Ofc. Brogdon's

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

knee was in contact with Decedent's cheek or neck, it did not remain there long as Decedent's sporadic movements caused Ofc. Brogdon's knee to slip back and forth on Decedent's body. *Id.,* pgs. 44:21-45:5. Mr. Pernell testified that Ofc. Brogdon was doing all he could to keep Decedent down while Decedent was moving around as if Decedent got up, "both of them would have been in trouble". *Id.,* pgs. 45:17-21, 47:8-48:5. Finally, Cpl. Smith testified that at the time he was observing Decedent suffer a medical emergency, Ofc. Brogdon did not have any body part on Decedents' head, jaw, or neck. There are also absolutely no evidence establishing that anything Ofc. Brogdon did asphyxiated Decedent or caused his death in anyway. Additionally, there is absolutely no evidence in this case establishing that the limited hold down force used by Ofc. Brogdon on Decedent was not justified or objectively unreasonable, and thus Ofc. Brogdon is entitled to judgment as a matter of law.

### c.  Cpl. Smith

Cpl. Rick Smith did not become physically involved in this arrest incident until the latter end of the struggle. The force used by Cpl. Smith on Decedent here is limited to only the minimal pressure he maintained on Decedent's right shoulder, using his body weight from his hands and arms, to keep Decedent on the ground. **Exh. E**, pgs. 67:15-68:8. Here, Cpl. Smith was putting only "light pressure" on Decedent's right shoulder, while also leaning forward in an attempt to make eye-contact and use his voice to create a rapport with Decedent who was vigorously resisting. *Id.,* pg. 69:3-10. There is absolutely no evidence in this action showing Cpl. Smith used anything but reasonable and justified force on the resistive Decedent, and there is certainly no evidence establishing that Cpl. Smith caused Decedent's death in anyway. As such, Cpl. Smith is entitled to judgment as a matter of law.

As in *Gregory* and *Montez,* although Decedent's death here was tragic, there is simply no evidence establishing that there is any triable issue of fact that the force used by these three officers on Decedent was objectively reasonable, regardless of the ultimate cause of Decedent's death. Per *Gregory* and *Montez,* this entitles all of the individual Defendants here to judgment as a matter of law as to Plaintiffs' Fourth Amendment excessive force claim (and the related state claims as shown below). Regardless, all three of these officers here are also entitled to qualified

1    immunity, as shown below.

2      **B.**    **The Defendant Officers Are Entitled to Qualified Immunity**

3      "The doctrine of qualified immunity protects government officials from liability for civil

4 damages insofar as their conduct does not violate clearly established statutory or constitutional

5 rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223,

6 231, (2009). Here, as explained above, the Defendant officers did not violate Decedent's Fourth

7 Amendment constitutional rights. However, even if Defendants' actions did arguably violate the

8 Fourth Amendment, there is no clearly established case law that would have put these Defendants

9 on notice that their limited actions during Decedent's detention was in violation of the Fourth

10 Amendment.

11      "A clearly established right is one that is sufficiently clear that every reasonable official

12 would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct.

13 305, 308, 193 L. Ed. 2d 255 (2015). The Supreme Court has repeatedly—and recently—

14 "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a

15 high level of generality.'" *White v. Pauly*, 580 U.S. ____, 137 S. Ct. 548, 196 L. Ed. 2d 463, 2017

16 U.S. LEXIS 5, at *9 (Jan. 9, 2017), quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

17 Rather, "clearly established law must be particularized to the facts of the case." *Id.* (internal

18 quotation marks and citation omitted). The appropriate inquiry is "whether it was clearly

19 established that the Fourth Amendment prohibited the officer's conduct in the situation [he]

20 confronted." *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015).

21      Here, there is case law establishing that "officers [who] allegedly crushed [a subject]

22 against the ground by pressing their [whole body] weight on his neck and torso, and continuing to

23 do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his

24 back and he was offering no resistance," is a violation of the Fourth Amendment. *Drummond*,

25 343 F.3d at 1061. However, there is absolutely no clearly established case law that would have

26 warned the Defendant officers in this case that their use of verbal commands and limited pressure

27 applied to small portions of Decedent's body with limited weight from only their arms, hands

28 (and even possibly Ofc. Brogdon's knee and foot), though Decedent was in the prone position on

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

the ground and handcuffed, was a violation of the Fourth Amendment. This is true especially in this situation wherein the subject appeared to be high on drugs, acting irrationally, paranoid, was violently resisting and grabbing for an officers duty belt, with innocent bystanders nearby.

There is simply no case law that would have put any reasonable officer on notice that the limited actions used by Defendant Officers in this case, violated Decedent's Fourth Amendment rights. *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015). Even if a violation can arguable be shown by Plaintiffs, the officers are entitled to some breathing room for their limited reactions to Decedent's vigorous movements and minimal force to keep the handcuffed Decedent to the ground. As such, all of the individual Defendant officers are entitled to qualified immunity.

**C.      Plaintiffs' Fourteenth Amendment Claim For Violation of Plaintiffs' Rights To Familial Relationship, Fails.**

"The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child." *Yount v. City & Cty. of S.F.*, No. C 11-1141 MEJ, 2013 U.S. Dist. LEXIS 101457, at *20 (N.D. Cal. 2013), citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). "Official conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Plaintiffs here are the purported children of Decedent and Decedent's mother as well.

To prevail on a 42 U.S.C. § 1983 due process claim, a plaintiff must first prove a violation of the underlying constitutional right. *Daniels v. Williams*, 474 U.S. 327, 330 (1986); *J.P. ex rel. Balderas v. City of Porterville*, 801 F. Supp. 2d 965, 988 (E.D. Cal. 2011) ("Where a claim for interference with familial relationships is integrally predicated upon, or entwined with, other conduct that is alleged to be unconstitutional, a finding that the other conduct was constitutional generally will preclude recovery for interference with familial relationship).

Here, Plaintiffs' claim for violation of their Fourteenth Amendment Right to Familial Relationship is predicated on their First Cause of action for excessive force, in violation of the Fourth Amendment. Exh. A, ¶ 49. Since the undisputed facts in this case fail to establish that

1  Defendant Officers here used excessive force, and since Defendant officers here are entitled to

2  qualified immunity on Plaintiffs' Fourth Amendment claim, Plaintiffs' Fourteenth Amendment

3  claim for violation of their Right to Familial Relationship must also fail.

4       Additionally, a parent's Fourteenth Amendment right to the companionship of a child is

5  violated by a police officer when they act "with a purpose to harm" the member that is "unrelated

6  to legitimate law enforcement objectives." Johnson v. Bay Area Rapid Transit Dist., 724 F.3d

7  1159, 1168-69 (9th Cir. 2013), citing Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008).  Due

8  to the rapidity of this incident, clearly the "purpose to harm" standard would control (as opposed

9  to the deliberate indifference standard when there is time for deliberation).  Here, because

10  Plaintiffs' cannot show the Officers here acted with any purpose to harm unrelated to a legitimate

11  law enforcement objective (since all force used on Decedent was reasonable in response to his

12  escalating resistance), Plaintiffs' Fourteenth Amendment claim fails for this reason as well.

13      **D.**    **Plaintiffs'** *Monell* **Claim(s), Fails.**

14       A municipality may be liable under § 1983 if the municipality "subjects" a person to a

15  deprivation of rights or "causes" a person "to be subjected" to such deprivation. *Monell v. N.Y.*

16  *City Dep't of Social Servs.*, 436 U.S. 658, 691-92 (1978).  Municipalities cannot be held

17  vicariously liable under § 1983 . Id. at 691-92.  Absent a formal governmental policy, a plaintiff

18  must show a "longstanding practice or custom which constitutes the standard operating procedure

19  of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  A plaintiff

20  must also show that the custom or policy was the moving force behind the employee's violation

21  of constitutional rights. *Long v. Cty. of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006).  A *Monell* type

22  claim could be proven in other ways, such as a failure to train employees which shows deliberate

23  indifference or ratification, none of which is implicated here.

24       Here, Plaintiffs' entire *Monell* claim relies on their underlying claim for violation of the

25  Fourth Amendment by use of excessive force by the individual Defendant officers. Exh. A, ¶¶

26  51-55.  Plaintiffs allege that the City of Antioch: (1) ratified "misconduct and/or or civil rights

27  violations by the Antioch Police"; (2) were deliberately indifferent to the "misconduct by

28  Defendants," and (3), "were on notice of the Constitutional defects in their training of Antioch

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1    police officers," with regard to "unlawfully using excessive force to make detentions."

2    Other than using the buzzwords, Plaintiffs have no evidence to support a *Monell* claim in

3    this case. First of all, without showing a Fourth Amendment violation, Plaintiffs *Monell* claim

4    falls flat on its face. *Montez,* 2017 U.S. Dist. LEXIS 94180, at *15 ("Because Plaintiffs have

5    failed to put forth sufficient evidence to show that there was any underlying constitutional

6    violation, their *Monell* claim also fails.").

7    The City had a use of force policy that regulated the allowable force by officers in the

8    field and such policy comports with the *Graham* standards. **Exh. H, Use of Force Policy**.

9    Further, Plaintiffs have no evidence of other constitutional violations, lack of training of these

10   officers or any other basis to prove a *Monell* claim. Thus, the City is entitled to judgment as a

11   matter of law as to Plaintiffs' *Monell* claims.

12   **E.    Plaintiffs' Related State Law Claims Also Fail.**

13   Here, because Plaintiffs have not and cannot proffer evidence establishing that Defendant

14   Officers used unreasonable force on Decedent, all of Plaintiff' state law claims including claims

15   for violation of the Bane Act, Negligence, Assault, and Battery, fail as well. All Defendants are

16   thus entitled to judgment as a matter of law as to these state law causes of actions and dismissal of

17   this action, with prejudice.

18   When a plaintiff "asserts no California right different from the rights guaranteed under

19   the Fourth Amendment, . . . the elements of the excessive force claim under § 52.1 are the same

20   as under § 1983." *Montez,* 2017 U.S. Dist. LEXIS 94180, at *15-16, *citing Cameron v. Craig*,

21   713 F.3d 1012, 1022 (9th Cir. 2013). Here, Plaintiffs' Fifth Cause of Action for violation of

22   California Civil Code § 52.1 "is premised entirely on the alleged violation of the Fourth

23   Amendment." *Montez,* 2017 U.S. Dist. LEXIS 94180, at *16; Exh. A, ¶¶ 60-64. Because, as

24   shown above, Plaintiffs' Fourth Amendment claim fails, "so too does their § 52.1 claim."

25   *Montez,* 2017 U.S. Dist. LEXIS *16.

26   In terms of Plaintiffs' assault and battery claims, "it is clear that an assault and battery

27   claim against a police officer requires that unreasonable force be established." *Nelson v. City of*

28   *Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010). Because the undisputed facts here establish

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1  that officers acted reasonably, Plaintiffs' cannot prove their state law claims for either assault, or

2  battery. All Defendants are entitled to judgment as a matter of law as to these claims.

3       In terms of Plaintiffs' negligence claim, "[i]n order to prove facts sufficient to support a

4  finding of negligence, a plaintiff must show that the defendant had a duty to use due care, that he

5  breached that duty, and that the breach was the proximate or legal cause of the resulting injury."

6  *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629, 160 (2013). Nonetheless, "[a]s long as an

7  officer's conduct falls within the range of conduct that is reasonable under the circumstances,

8  there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the

9  least likely to cause harm and at the same time the most likely to result in the successful

10  apprehension of a violent suspect, in order to avoid liability for negligence." *Brown v.*

11  *Ransweiler,* 171 Cal. App. 4th 516, 537-538 (2009). As established above, regardless of whether

12  or not Officers' actions here *caused* Decedents' death, or whether Decedents' death was caused

13  by Excited Delirium due to his own bad decisions, the Officers' conduct here was reasonable

14  "under the circumstances" to which the officers faced. Thus, Plaintiffs' cannot demonstrate any

15  negligence and Defendant Officers are entitled to judgment as a matter of law as to that claim as

16  well.

17  ## VI. CONCLUSION

18       Based on the foregoing, Defendants are entitled to judgment as a matter of law as to all of

19  Plaintiffs' claims in this action. Essentially, because the undisputed facts here illustrate that the

20  officers acted objectively reasonably in their limited force on Decedent and/or are entitled to

21  qualified immunity for the force necessarily and justifiably used, Plaintiffs' cannot prove any of

22  their claims in this case.

23  Dated: December 14, 2017      McNAMARA, NEY, BEATTY, SLATTERY,
                      BORGES & AMBACHER LLP

24

25          By: _____

26              Noah G. Blechman
            Amy S. Rothman

27              Keren Schlank
            Attorneys for Defendants

28              CITY OF ANTIOCH; RICK SMITH; CHRIS KIDD;
            and CASEY BROGDEN