# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

C.R., co-successor-in-interest )
to Decedent Rakeem Rucks, by )
and through his Guardian Ad )
Litem Beverly McIntosh; I.R., )
co-successor-in-interest to )
Decedent Rakeem Rucks, by and )
through his Guardian Ad Litem )
Beverly McIntosh; R.R., )
co-successor-in-interest to )
Decedent Rakeem Rucks, by and )
through his Guardian Ad Litem )
Beverly McIntosh; J.R., )
co-successor-in-interest to )
Decedent Rakeem Rucks, by and )
through her Guardian Ad Litem )
Jasmine Williams; and Debra )
Moore, individually, )
)
        Plaintiffs, )
)
      vs. ) No.: C16-03742JST
)
CITY OF ANTIOCH, a municipal )
corporation; and DOES 1-50, )
inclusive, individually, )
jointly and severally, )
)
      Defendants. ) CERTIFIED COPY
_____)


DEPOSITION OF SERGEANT RICHARD SMITH

TUESDAY, OCTOBER 3, 2017




REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

DEPOSITION OF SGT. RICHARD SMITH

1    of the witnesses or Mr. Rucks or conduct their

2    investigation, because they had an apartment door that

3    had been forced open.  They didn't know if they had a

4    potential -- potential for burglary or vandalism, an

5    actual assault victim.  They didn't -- or someone with

6    guns.  They didn't know.

7         This complex is a high-crime area and a

8    high-crime neighborhood, which we've had numerous

9    incidents throughout the entire area.

10        Q.   Okay.  So when you -- at the time when you

11   left to go back to the department, Mr. Rucks was not in

12   custody to your knowledge?

13        A.   No, he was not.

14        Q.   Okay.  But in your -- when you -- when you

15   left the complex, to your understanding, there wasn't

16   an active need for -- for your emergency presence; is

17   that correct?

18        A.   Correct.

19        Q.   At some point later, you ended up returning

20   back to the scene, correct?

21        A.   Yes.

22        Q.   And what prompted you to return back to the

23   scene?

24        A.   I heard they were now out with Mr. Rucks, and

25   I could hear -- I believe it was -- you get in this

52

DEPOSITION OF SGT. RICHARD SMITH

1    business long enough, you can hear the voices of people

2    you work with and how the urgency sometimes changes in

3    their voice.  I don't know if it's just me or not, but

4    I could read something was going on.

5           And they had requested another unit, so I

6    self-dispatched myself to return because I knew I was

7    close by.  The police department is not far away from

8    Sycamore.

9        Q.   Can you give an approximation of how long of a

10   lapse in time that you left to go back to the

11   department and the time that you returned?

12       A.   Less than ten minutes.

13       Q.   Okay.  And during -- toward the end of that

14   ten minutes, when somebody -- one of the officers got

15   on the radio to ask for backup assistance; is that

16   correct?

17       A.   I believe so.

18       Q.   Do you remember what priority code?  Was it a

19   3 backup?  Do you remember what type of assistance they

20   were asking for?

21       A.   I believe -- this is a speculation.  I can't

22   recall exactly.

23       Q.   Okay.  We don't want you to -- we don't want

24   you to speculate.  I understand that it's something

25   that happened over two years ago.

53

DEPOSITION OF SGT. RICHARD SMITH

1          When you returned, what is your remembrance of

2    the urgency with which you returned to the apartment

3    complex?

4          A.    I know while I was in route initially -- or

5    not initially but for the second time, I was responding

6    back and knew they had contacted him.  And then in that

7    time frame, they requested Code 3 cover.

8          And that -- I wasn't too far away, which

9    brought me to activate my lights and siren and get

10   there quicker.

11        Q.    Okay.  So prior to the -- prior to the

12   officers requesting Code 3 cover, you were already in

13   route back to the apartments based on them having

14   located Mr. Rucks; is that correct?

15        A.    Correct.

16        Q.    And when you -- when you responded back to the

17   apartments for that -- for the second time, what did

18   you see upon returning to the apartment complex?

19        A.    As I pulled in from the Mahogany side, which

20   would be the southwest gate of the complex, because it

21   is a gated complex, a gentleman, an older black

22   gentleman -- I believe he was a resident of

23   Apartment 160.  I don't recall his name -- was in the

24   roadway waving me down.

25              As soon as you come in the gate, there's

54

DEPOSITION OF SGT. RICHARD SMITH

```
 1    a -- the first row of building.  Then there's a
 2    walkway.  Then there's the next row, two sets of
 3    buildings, I believe, or one set.  And then there's a
 4    fire lane.
 5             In that fire lane of the complex, he's
 6    standing in the parking lot near that fire lane waving
 7    me down and pointing towards the fire lane into the
 8    complex.
 9        Q.   Okay.  I'll represent to you the man's name is
10    Lawrence Parnell.  Did -- had you ever seen or met
11    Mr. Parnell prior to him flagging you down in the
12    parking lot?
13        A.   No, I did not.
14        Q.   Okay.  So when you saw the person flagging you
15    down, you made an assumption that he was flagging you
16    down to come to -- to direct you to where the officers
17    were located; is that --
18        A.   That was my assumption, yes.
19        Q.   Okay.  And so you obviously parked your car,
20    got out, and then headed toward the direction that
21    Mr. Parnell was pointing?  Is that correct?
22        A.   As I parked my car, I could look over and see
23    Officer Kidd and Officer Brogden struggling with
24    Mr. Rucks.
25        Q.   Okay.  So when you pulled up, you saw the
```

55

DEPOSITION OF SGT. RICHARD SMITH

1    incident as it -- you saw where they were located at

2    the complex, right?

3        A.    Correct.

4        Q.    Okay.  When you arrived in the parking lot,

5    could you hear the incident from where you -- from the

6    parking lot?  Did you hear yelling? commotion?

7        A.    I could hear like grunt and groan, I believe,

8    and that was about it.  You could hear a struggle.  Put

9    it that way.

10        I couldn't hear anything clear audible or

11    anything like that other than a struggle, and I could

12    see a struggle.  They were probably 50 to 75 feet away

13    from me.

14        Q.    Okay.  And when -- so when you got out of your

15    car and you saw the struggle, did you -- did you run

16    up -- did you run up to -- to assist?

17        Were you -- I mean, what was your -- what was

18    your next step?

19        A.    Having my experience in this, my thought

20    was:  We need a WRAP.  And I believe somebody actually

21    requested a WRAP.  I can't remember who did.

22        But I went to the trunk of my car.  Realizing

23    my WRAP wasn't there, then I believe I got on the

24    radio and directed Officer Smith to respond with the

25    "WRAP Code 3," I believe.  I -- I think -- I gave him

56

DEPOSITION OF SGT. RICHARD SMITH

1     directions to respond as well.  And then I ran to them.

2         Q.   Okay.  Do you normally carry a WRAP in

3     your -- in your patrol vehicle?

4         A.   Yes, I do.

5         Q.   Okay.  So when you went to get in the trunk of

6     your patrol vehicle, you expected the WRAP to be there?

7         A.   Yes, I did.

8         Q.   Do you have any idea where the -- why the WRAP

9     wasn't in your patrol vehicle, or did you at any point

10    determine why the WRAP wasn't in the vehicle?

11        A.   I believe when I started my shift in the

12    middle of the morning, I over -- oversight failed to

13    check the trunk to make sure the WRAP was there.

14             So I have no idea where it was.  That was my

15    oversight.

16        Q.   And who -- is the WRAP device normally kept in

17    all of the patrol cars or is it something that would

18    only be in supervisory vehicles?

19        A.   Every patrol car is supposed to have a WRAP in

20    the trunk.

21        Q.   Okay.  When you first arrived, did you see

22    either Officer Brogden or Officer Kidd's patrol car

23    nearby?

24        A.   As I arrived and I was getting out,

25    Officer Kidd goes, Hurry up.  Get over here.  We need

57

DEPOSITION OF SGT. RICHARD SMITH

1   help.

2          And I was watching -- Officer Kidd had

3   Mr. Rucks, as previously described, in a figure-four

4   leg-hold in which he had -- what I could see was one

5   leg folded with the ankle to the knee of the other leg

6   and the other leg folded up and over.

7          And Officer Kidd was attempting to hold

8   Mr. Rucks in that position.  But I was watching

9   Mr. Rucks surprisingly able to lift him up in the air

10  off that hold, basically with one leg, and then at the

11  same time, saw Officer Brogden trying to maintain -- I

12  believe it was the left side of Mr. Rucks by holding

13  his left hand and had his head down on his left

14  shoulder blade of his back.

15         And I was watching Mr. Rucks lift his upper

16  body and arch his back and flail around at the same

17  time.  That caused my urgency to run towards them.

18     Q.   Okay.  So those are things when you arrived to

19  respond.

20         And when you responded and saw Mr. Rucks, he

21  was alive?

22     A.   Very much so.

23     Q.   Okay.  So Officer Brogden requested that

24  you -- that you -- that you come and assist them,

25  correct?

58

DEPOSITION OF SGT. RICHARD SMITH

1      A.   He was kneeling off to the -- Mr. Rucks was

2  facedown and Officer Brogden was off to what would be

3  Mr. Rucks' left side, off the left side, to the point

4  where to describe it, it would be his right hand was

5  holding Mr. Rucks' left hand, left handcuffed hand.

6          And we're taught a control hold of bringing

7  the wrist up slightly, not off the body but just

8  pushing the wrist upward.  In this case it would have

9  been forward, towards his head but not pushing his arms

10 up, just the wrists to maintain that, while pushing

11 back down into the small of his back.  It's a control

12 hold.

13         At the same time, he was using his left palm

14 and hand, and what I saw, was trying to hold Mr. Rucks'

15 left side and shoulder down on the ground, keep him

16 from like he was doing, bucking up or arching his body

17 upward.

18      Q.   Okay.  And what you described with

19 Officer Brogden, he had one of Mr. Rucks' hands in,

20 what, a sort of pain compliance hold?

21      A.   Yes.

22      Q.   Okay.  But when you saw officer Brogden, he

23 wasn't holding Mr. Rucks' other handcuff but had

24 his -- had his hand bent somewhat backwards?

25      A.   Had his hand not backwards.  It wasn't

                                                        60

DEPOSITION OF SGT. RICHARD SMITH

1    forearm.  That would be the best description of the way

2    I could really do it.

3            BY MS. NOLD:

4    Q.    Okay.  And -- and with that -- and with that

5    hold, that hold that -- which you just described

6    utilizes the hand only and not the handcuffs, correct?

7    A.    We're using the hand and the arm, itself, in a

8    proper technique, what we have used, pain compliance.

9            You're not using the handcuffs for compliance.

10   The handcuffs are strictly a restraint device.  They're

11   not a pain compliance device.

12   Q.    So at any point, did you see Officer Brogden

13   lift or raise Mr. Rucks' hand by using the handcuffs?

14   A.    He didn't raise his hand upward.  If you're

15   referring to "raise," he wasn't -- with Mr. Rucks being

16   facedown, the referral of "raise," he probably did

17   raise it, but he didn't raise it up off his back.  He

18   raised it horizonal, towards his head, basically

19   driving -- as I described, you have the hand.  You

20   would push it down against the back, pushing it upwards

21   slightly.

22           And it gives you more control of the hand so

23   that they can't use their leverage for the

24   responsible -- or a person can't use their leverage to

25   pull those hands off their back or twist their body.

                                                          62

DEPOSITION OF SGT. RICHARD SMITH

1    A.   We would do something along the lines of, This

2    is how it's going to be done.  Officer safety, number

3    one for him and number one for my officers.

4    Q.   Okay.  But on that day, whatever information

5    you learned about Mr. Rucks, there was no officer

6    safety flag that you were aware of at that time?

7    A.   No.

8    Q.   Okay.  And during the course of the incident

9    that you were present, Mr. Rucks was handcuffed that

10   entire time, correct?

11   A.   Correct.

12   Q.   Okay.  When you came on the scene and

13   Officers Brogden and Kidd were already in physical

14   contact with Mr. Rucks, what did you do at that point?

15   A.   I came up and began assisting Officer Brogden

16   in trying to control Mr. Rucks' upper body.  At the

17   same time, I began trying to call Mr. Rucks by his

18   first name and trying to see if I can establish a

19   rapport.  It is what we commonly term as "verbal judo,"

20   to calm someone down.

21        And I started calling him by his first name.

22   He looked over towards me and he seemed to calm down.

23   At the same time, I maintained a similar grip that

24   Officer Brogden had but with his right hand, basically

25   his upper hand, in the palm of mine and pushing up

67

DEPOSITION OF SGT. RICHARD SMITH

1    towards his foreman.  And at the same time, I had his

2    right hand on the outer part of his shoulder, trying to

3    keep him from bucking his shoulders up.

4            And as I was doing it, it seemed that he

5    calmed down because he stopped bucking around, stopped

6    trying to kick Officer Kidd off.  He looked at --

7    towards me, actually made eye contact with me, but just

8    started a mix of grunts and groans.

9        Q.   And when you first saw or made eye contact

10   with Mr. Rucks, do you -- do you recall seeing any sort

11   of injuries, bruises or marks or anything that you

12   perceived to be an injury on his face?

13       A.   His face was unremarkable, no injury.

14       Q.   And when you described your -- your contact

15   with Mr. Rucks' shoulder, would that have been his

16   right shoulder?

17       A.   It would have been his right shoulder, right

18   about his shoulder blade and upper shoulder.  I

19   basically put light pressure there in trying to calm

20   him.

21       Q.   And when you say you "put light pressure" on

22   his shoulder and shoulder blade area, was that pressure

23   being applied with your hand?

24       A.   It was my hand and my arm only.

25       Q.   Okay.  Did -- at any point during the

68

DEPOSITION OF SGT. RICHARD SMITH

1   incident, did you ever -- did you ever place your knee

2   on Mr. Rucks' shoulder or upper torso at all?

3       A.   No, because I actually knelt my head down

4   towards his face, trying to, like I said before,

5   establish that eye contact and rapport, calling him by

6   name, asking him to, "Calm down.  We're not here to

7   hurt you," trying to get a rapport going with him to

8   see if I can calm him.

9            It's worked with other suspects in the past,

10  and it's just that's my way of doing business.

11      Q.   Okay.  And you indicated that Mr. Rucks began

12  to calm down at that point?

13      A.   Dramatically, yes.

14      Q.   Okay.  When he began to calm down, did you

15  notice anything that seemed like he was having

16  shortness of breath, trouble breathing?  Was he

17  breathing hard?

18      A.   I believe I had already somewhere in that

19  point in time, because, number one, I knew the heat was

20  close to 100 degrees, if not hotter.

21           What we were wearing, I know I was soaked in

22  sweat.  I had already called for what we refer to as

23  "Code 2 medical," a respond and stage.  Basically, that

24  tells the ambulance and fire department to respond to

25  our location but to stage close by, don't come in until

69

DEPOSITION OF SGT. RICHARD SMITH

1    we say, Hey, we need you now, until the scene is

2    secure.  I believe I already called for a Code 2

3    medical and they were already coming.

4              As he was calming down -- I was reviewing my

5    transcript last night from my interview, and I believe

6    I used the wrong terminology, because, again, it was a

7    long day.  Not "positional asphyxiation" but "excited

8    delirium" is what I meant to say in that transcript.

9    That was an error I did find.  You asked earlier.

10             I had some training in excited delirium.

11   We've had some in-service training and I did some

12   reading.  And based on his reaction and what was going

13   on, lack of response, I was beginning to worry about

14   that.

15             But at the same time, he's a larger guy, like

16   myself, and we're dealing with a struggle over a period

17   of time in high heat.  I started to worry about a bunch

18   of different medical concerns.

19             Plus, the fact that his actions appeared to be

20   similar to someone that was under the influence of

21   either a narcotic or multiple narcotics or having some

22   kind of an episode of some type, with that being

23   considered, I started taking all that totality from a

24   supervisory standpoint, that I need to get medical

25   there.  But once we had it secure, I was going to have

70

DEPOSITION OF SGT. RICHARD SMITH

1    them come in.

2        Q.   So it sounds like you're saying based on the

3    training that you had about excited delirium and the

4    heat and the factors that you were aware of at the

5    time, you be -- you became concerned that there might

6    be some sort of medical incident.  Is that accurate?

7        A.   That's why I started medical, correct.

8        Q.   Okay.  But at that time, they were -- they

9    were started at -- the Code 2 then comes to stage.

10   Did -- does that mean that they were to arrive but to

11   wait and not actually come and -- come and make contact

12   with Mr. Rucks yet?

13       A.   Well, have them in route.  And a Code 2 means

14   they're not coming blowing red lights, lights and

15   siren, and getting here as quickly as they can.  They

16   do get there as quickly as they can but in a safe

17   manner.

18            As a supervisor, I've got to take the totality

19   of public safety as well.  If it requires a Code 3

20   response, I would have requested a Code 3.

21            Based on what I was seeing, I thought I was

22   reaching out to Mr. Rucks and he was calming down

23   because I was speaking with him.  But I was still

24   concerned about, number one, the length of the

25   struggle, the heat, and all the other stuff I

71

DEPOSITION OF SGT. RICHARD SMITH

1  previously mentioned.  So I'm taking that as a

2  totality.

3       But as I'm engaged in conversation with

4  Mr. Rucks, I start to notice that he's not making eye

5  contact anymore, he's not making the grunts, but he's

6  still breathing.  So at that point in time, I believe I

7  got on the radio and advised them to go Code 3 and

8  directly respond in.

9       Q.   Okay.  I just want to get clarity.

10      You talked about when you were having a

11  conversation with Mr. Rucks.  Was he -- was he

12  interacting back with you, or were you just talking to

13  him?

14      A.   He was making eye contact with me.  And when I

15  looked at him and spoke with him, he would look over at

16  me and he would turn his head and keep it down.  And if

17  I talked to him in a calm voice, he would calm down.

18      But then he would kind of like grunt and groan

19  and start up again.  Then I'd try to calm him again and

20  remind him that we're not here to hurt him, we're here

21  to help him, and that I needed him to calm down so that

22  we could.

23      He would give me the response of looking at

24  me.  So that way, it made me think that he was

25  responding to what I was trying to do at the same time.

72

DEPOSITION OF SGT. RICHARD SMITH

1      Q.    Okay.  And at the time when

2  Mr. Rucks -- immediately after you had contact with

3  Mr. Rucks, I think that you had indicated that you

4  had -- sounded like you were saying you kind of kneeled

5  down towards him to try and make eye contact with him?

6      A.    I was down on my knees already, and I

7  basically, while his holding right shoulder -- and I

8  still had control of his right hand with my left

9  hand -- I leaned down and over more and put my face

10  almost to his face so that he could actually have the

11  ability that we make eye contact.  And the point of

12  that was -- was to try to, like I explained, to get a

13  rapport with him.

14      Q.    And -- and during that time, did you have any

15  concerns with Mr. Rucks' breathing?  Was he breathing

16  heavily, panting, gasping for air, anything to indicate

17  to you that he may have been having some struggles with

18  his ability to breathe?

19      A.    He wasn't breathing any different that I

20  wouldn't expect someone that was in a struggle, to

21  begin with.

22         My officers were breathing heavy.  I was

23  breathing heavy because we're struggling with a

24  gentleman that's -- I believe he was almost bigger than

25  me and he was abnormally strong.  And that got me

73

DEPOSITION OF SGT. RICHARD SMITH

1    thinking even more of the fact that this was -- we're

2    dealing with someone under the influence.

3        Because, again, like I said, Officer Kidd is a

4    much smaller man than he was at the time, but I watched

5    him get lifted in the air from a figure-four hold.

6    Having been put in that hold myself during training,

7    that's a very difficult thing to do.

8        Q.   Right.  So he -- Mister -- then when -- during

9    the time that you were there, Mr. Rucks was panting,

10   things of that -- things that you considered to be

11   consistent with everyone that had been involved in a,

12   what, five-plus-minute-long physical struggle?

13       A.   My -- my question maybe would be, if you've

14   been to the gym or been in a physical altercation of

15   some type, wrestling, whatever it is, or -- you, too,

16   will get gassed in time.

17       And my belief was he was basically -- the term

18   would be "gassing out."  Basically, he's running out of

19   energy, he's giving up, you know, he's submitting, you

20   know, "I've done my fight.  I've got my point.  I'm

21   done."  That was my belief.

22       Q.   But at some point shortly after that, it

23   sounds like Mr. Rucks was no longer able to make eye

24   contact or was not making eye contact with you?

25       A.   I can tell you I've been around long enough

74

DEPOSITION OF SGT. RICHARD SMITH

1   that you can watch people's demeanor change, their body

2   language, things of that nature.  And having some of my

3   background when I was a CSI investigator and working as

4   an investigator in investigations doing crime scenes

5   and autopsies, I think I just got to go -- the look and

6   something in my training made me -- and my experience

7   made me think something's up.

8          And that's why I got on the radio and called

9   for medical right away.  And we had already begun to

10  put him in the WRAP at that time because Officer Smith

11  had arrived.  And I believe we had the lower portion of

12  his legs done.  And as we did so, that's when I noticed

13  something's not right.

14         And I directed them to roll him over, and I

15  began checking for a carotid pulse, which is on the

16  neck.  Then I didn't -- couldn't find nothing there.

17         And we're trained to next check for brachial,

18  which is on the arm.  I immediately checked for the

19  brachial.

20         I did a sternum rub, which is basically you

21  take your knuckles and you drive them in the center of

22  the chest, to the point of discomfort for somebody.

23  And it's a pain sensory that will bring people right

24  out if they're trying to play possum, which -- or even

25  if they passed out, it usually brings them back awake.

75

DEPOSITION OF SGT. RICHARD SMITH

1        I got no response.  And that's about the same

2   time ConFire arrived.  I saw the big red fire truck

3   show up.

4        Q.   And prior to the fire coming and making

5   contact with Mr. Rucks, I believe Officer Brogden began

6   doing chest compressions on him?

7        A.   When I -- when I got no response from any of

8   that, I gave the direction for Officer Brogden to begin

9   CPR.

10        And then I immediately got up from my

11   position, leaving him there to attend to Mr. Rucks, and

12   went over and alerted ConFire.  I believe I used the

13   term, "He coded out," because I was getting no response

14   and I wanted to get the exurgent [ph] -- ex --

15   exurgency [ph] to them -- or urgency to them, as much

16   as I can, to tell them, "Bring your gear.  Get over

17   here now."

18        Because I worked with ConFire.  No offense,

19   sometimes they take their time to get the stuff off the

20   truck and they kind of get there.

21        This time the crew grabbed their stuff and

22   they ran to Mr. Rucks.  And shortly thereafter, the

23   ambulance showed up.

24        Q.   Was it your understanding that the fire was

25   coming in response to your request to have medical come

76

DEPOSITION OF SGT. RICHARD SMITH

1    you provided that information to, about the positional

2    asphyxiation?

3         A.   Well, I -- the first time I think I used the

4    term was during my interview by the detective.   That

5    was Detective Colley, the first time I used -- I

6    brought that up.   Prior to that, it was -- heck, I

7    don't know what happened to him.   He was here one

8    minute and he's gone the next.

9         Q.   Okay.   And during your physical contact with

10   Mr. Rucks or -- strike that.

11             During the period of time when you -- during

12   your second response to Delta Pine Apartments, did you

13   ever see Officer Brogden place either of his knees on

14   Mr. Rucks' shoulder?

15        A.   Never.

16        Q.   And during -- during the same time frame, did

17   you ever see Officer Brogden place his knee on

18   Mr. Rucks' head?

19        A.   No, he did not.

20        Q.   And during the time you were there, did you

21   ever see Officer Brogden place his knee on Mr. Rucks'

22   neck or neck area?

23        A.   His knees were off to the side.   At no time

24   were his knees on any part of his body that I ever saw.

25        Q.   So Officer Brogden's contact with Mr. Rucks in

81

DEPOSITION OF SGT. RICHARD SMITH

1    your presence was exclusive to his hands contacting

2    Mr. Rucks?

3         A.    Correct.

4         Q.    Did you ever see anyone from Antioch Police

5    Department place their knees on Mr. Rucks' neck, back,

6    or -- or head?

7         A.    No.  The only two people that were closest to

8    his upper body were myself and Officer Brogden, when I

9    was present.

10        Q.    Right.  And I'm not asking you to speculate

11   about what happened during the -- you know, during the

12   five -- what I understand to be approximately five

13   minutes of the struggling.

14             I only want to know what you saw with your own

15   eyes.

16             MR. BLECHMAN:  You need a break or anything?

17             THE WITNESS:  I'm good.

18             (Discussion off record)

19             BY MS. NOLD:

20        Q.    During the time that you were -- during the

21   time that you were present, Mr. Rucks -- where

22   was -- where was -- strike that.

23             During the portion of the incident that you

24   were present, was Mr. Rucks on his stomach during that

25   entire time?

82

1   perform CPR, that there needs be chest compression and

2   airway breathing?

3          MR. BLECHMAN:  Calls for speculation.  Calls

4   for expert testimony.  Lacks foundation.  Vague and

5   ambiguous and overbroad.

6          Go ahead.

7          THE WITNESS:  That depends on the situation.

8          BY MS. NOLD:

9   Q.   Have you been -- are you certified in CPR?

10  A.   Yes, I am.

11  Q.   And is there anything that you're aware of

12  other than the instance with -- or the circumstance

13  with Mr. Rucks that would have made airway breathing

14  not applicable or not be an appropriate method of

15  performing CPR in conjunction with chest compression?

16  A.   It might not -- my speculation would have

17  been?  It may not have been -- it's time.  They may

18  have just started the chest compression.  Like I said

19  before, fire arrived very quickly.

20         And when I yelled at them, they came that way.

21  They had just begun CPR, and they may not have been in

22  a cycle, my speculation would be, to begin the

23  breathing or maybe he didn't need the breathing.  It

24  just depends.

25         I wasn't there administering the CPR, to take

93

DEPOSITION OF SGT. RICHARD SMITH

```
 1              MS. NOLD:  Let's go off the record and take
 2      five.  I may have another question or two but not much
 3      more.  It's probably going to be -- go into your
 4      overtime now.
 5              (Recess taken from 3:57 p.m. to
 6              4:09 p.m.)
 7              BY MS. NOLD:
 8         Q.   I believe you indicated earlier that at no
 9      point during the course of your contact with Mr. Rucks
10      did you ever hear him say that he couldn't breathe,
11      correct?
12         A.   Never heard those words, no.
13         Q.   Okay.  You were present at the Coroner's
14      Inquest, right?
15         A.   Yes, I was.
16         Q.   And during that Coroner's Inquest, do you
17      recall Brian Rose -- Detective Brian Rose testifying?
18         A.   Vaguely.  I'm sorry.  I was semi-comatosed
19      from being -- lack of sleep.
20         Q.   And during what you -- and what you do recall,
21      do you recall Detective Rose saying that there was
22      witnesses or a witness that indicated that Mr. Rucks
23      was saying that he couldn't breathe?
24         A.   I don't recall.
25         Q.   Okay.  Outside of conversations with counsel,
```

115

DEPOSITION OF SGT. RICHARD SMITH

```
1    STATE OF CALIFORNIA    )
                            ) ss.
2    COUNTY OF CONTRA COSTA )

3

4         I, Angelica R. Gutierrez, a licensed Certified

5    Shorthand Reporter, duly qualified and certified as such

6    by the State of California;

7         That prior to being examined, the witness named in

8    the foregoing deposition was by me duly sworn to testify

9    to the truth, the whole truth, and nothing but the truth;

10        That the deposition was by me recorded

11   stenographically at the time and place first herein

12   mentioned, and the foregoing pages constitute a full,

13   true, complete and correct record of the testimony given

14   by the said witness;

15        That I am a disinterested person, not being in any

16   way interested in the outcome of said action, nor

17   connected with, nor related to any of the parties in said

18   action, or to their respective counsel, in any manner

19   whatsoever.

20

21             DATED:_October 03, 2017_____

22

23        _/s/Angelica R. Gutierrez_____

24        ANGELICA R. GUTIERREZ, CSR No.  13292

25
```

117

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

C.R., co-successor-in-interest)
to Decedent Rakeem Rucks, by  )
and through his Guardian Ad   )
Litem Beverly McIntosh; I.R., )
co-successor-in-interest to   )
Decedent Rakeem Rucks, by and )
through his Guardian Ad Litem )
Beverly McIntosh; R.R.,       )
co-successor-in-interest to   )
Decedent Rakeem Rucks, by and )
through his Guardian Ad Litem )
Beverly McIntosh; J.R.,       )
co-successor-in-interest to   )
Decedent Rakeem Rucks, by and )
through her Guardian Ad Litem )
Jasmine Williams; and Debra   )
Moore, individually,          )
                              )
            Plaintiffs,       )
                              )
        vs.                   )  No.: C16-03742JST
                              )
CITY OF ANTIOCH, a municipal  )
corporation; and DOES 1-50,   )
inclusive, individually,      )
jointly and severally,        )
                              )
            Defendants.       )  CERTIFIED COPY
_____)


DEPOSITION OF OFFICER THOMAS SMITH

FRIDAY, OCTOBER 6, 2017


REPORTED BY:  LISA L. JONES, CSR #12982

1

1    A    I was at the PD, and Corporal Smith, who was on

2    scene, requested a wrap, and I answered up to respond.

3    Q    Okay.  So that would have been Corporal

4    Smith --

5    A    Correct.

6    Q    -- contacted you and asked you to bring a wrap

7    device to that location?

8    A    To the best of my recollection, he got on the

9    air and said, is there a unit with a wrap who can start,

10   and I answered up for that.

11   Q    So you had a wrap device in your vehicle?

12   A    I was at the station, so they're readily

13   available.

14   Q    Okay.  So you either had or got a wrap device

15   and then proceeded to the location?

16   A    Correct.

17   Q    Okay.  On that date were you a solo officer?

18   A    I was.

19   Q    Was there anyone else in the car with you, a

20   ride-along or any additional civilian?

21   A    No.

22   Q    Okay.  And when you first arrived at the Delta

23   Pines Apartment Complex, did you know where you were

24   going?  Did you know approximately where you were going

25   to be going within the complex?

18

DEPOSITION OF OFFICER THOMAS SMITH

1    the wrap device, was he moving at all to your knowledge?

2        A    Well, he was being moved, so -- I mean, yeah,

3    he was moving.

4        Q    Okay.  When you guys -- when you and the other

5    three officers were moving Mr. Rucks into the wrap

6    device, did he do anything that you recognized to be

7    moving on his own power?

8        A    No.

9        Q    Okay.  And when Mr. Rucks was being moved into

10   the wrap device, do you recall seeing his head?

11       A    You know, I don't.  I was focused on the legs

12   and then the wrap, so I had actually no contact or

13   really visual of his upper body.

14       Q    At some point while you were present, do you

15   recall being made aware that Mr. Rucks was under -- in

16   some sort of distress or being notified that

17   something -- there was something going wrong with

18   Mr. Rucks?

19       A    Yes.

20       Q    And what do you recall about that?

21       A    We had placed Mr. Rucks in the leg portion of

22   the wrap.  Several of the clips, there's three, were

23   secured, and then Corporal Rick Smith made a statement

24   regarding Mr. Rucks possibly suffering from some sort of

25   medical emergency.  I don't recall the exact verbiage

27

DEPOSITION OF OFFICER THOMAS SMITH

1    that was used, but he made some statement that made us

2    all stop and began assessing medical treatment.

3          Q     Okay.  So you don't recall the words used by

4    Corporal Smith, but you recall that it was something to

5    the effect that Mr. Rucks was having some kind of

6    medical distress?

7          A     I would say a medical emergency, yes.

8          Q     Okay.  Prior to Corporal Smith making the

9    statement about Mr. Rucks, that you believed to be

10   implying he was having some kind of medical emergency,

11   was there anything that you noticed about Mr. Rucks'

12   body, lack of movement, anything that would cause you to

13   believe that he was having some sort of medical

14   emergency or was not conscience?

15         A     No.

16         Q     In your presence, did Mr. Rucks make any kind

17   of movements to alert you that he might have been

18   conscience?

19         A     I don't recall, and it was because my sole

20   focus was getting that wrap prepared, and then the brief

21   contact I had with him was approximately three to five

22   seconds in moving him to that wrap.

23         Q     During the time when -- during the time of the

24   incident, from the time that you arrived till the time

25   that Mr. Rucks -- the time that you were put on notice

                                                        28

1  STATE OF CALIFORNIA        )

2                             )  SS.

3  COUNTY OF SACRAMENTO       )

4

5          I hereby certify that the witness, THOMAS
   SMITH, in the foregoing deposition appeared before me,
6  LISA L. JONES, a Certified Shorthand Reporter and a
   disinterested person.

7

8          Said witness was then and there at the time and
   place previously stated by me placed under oath to tell
9  the truth, the whole truth and nothing but the truth in
   the testimony given on the date of the within
10 deposition; that the deposition is a true record of the
   witness' testimony as reported by me.

11         The testimony of the witness and all questions
   and remarks requested by Counsel was reported under my
12 direction and control, caused to be transcribed into
   typewritten form by means of Computer-Aided
13 Transcription.

14         I am a Certified Shorthand Reporter licensed by
   the State of California, and I further certify that I am
15 not interested in the outcome of the said action, nor
   connected with, nor related to any of the parties in
16 said action, nor to their respective counsel.  I am not
   of counsel or attorney for either or any of the parties
17 to the case named in the within caption.

18         IN WITNESS WHEREOF, I have hereunto affixed my
   signature this 23rd day of October, 2017.

19

20

21  _/s/Lisa L. Jones_____
    LISA L. JONES
22  Certified Shorthand Reporter
    California License Number 12982

23

24                     --oOo--

25

                                                      43

# EXHIBIT G

1          UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4   C.R. et al.,

5           Plaintiff,

6       vs.                        No. C16-03742 JST

7   CITY OF ANTIOCH, et al.,

8           Defendant.

    _____

9

10

11

12

13

14      DEPOSITION OF ARNOLD ROBERT JOSSELSON, M.D.

15              Fairfield, California

16          Wednesday, October 11, 2017

17                  Volume 1

18

19

20

21

22   Reported by:

     JODI L. BOSETTI

23   CSR No. 11316, RPR

24   JOB No. 2723689

25   PAGES 1 - 143

                                            Page 1

1      A   Yes, over 7,000.

2      Q   Okay.  It also looks like you have some

3   publications over the years.  Any particular area that

4   you've published in, in terms of subject matter?

5      A   Mainly firearms injuries.                    09:13

6      Q   Okay.  And you've also given some

7   presentations.  And some of those presentations, as

8   listed in your CV, related to firearms-related issues?

9      A   Yes.

10     Q   All right.  We don't need to go through your   09:14

11   background.  I think you gave a little bit of your

12   background at the inquest that related to this death

13   of Mr. Rucks; is that correct?

14     A   I did, yes.

15     Q   Okay.  You performed the autopsy on           09:14

16   Mr. Rucks; is that accurate?

17     A   Yes.

18       MR. BLECHMAN:  Okay.  Let me mark next a copy of

19   the coroner's report in this matter.  This was

20   produced in this case as APD -- Bates stamp APD396     09:14

21   through 405.  There's a copy for you and a copy for

22   Counsel.

23         (Deposition Exhibit 27 marked.)

24   BY MR. BLECHMAN:

25     Q   Just take a quick look at that and            09:14

                                                    Page 7

```
 1    BY MR. BLECHMAN:

 2        Q    And I'll show you those as well.  So just

 3    take a second and see if those are the autopsy photos.

 4        A    They are.

 5        Q    Okay.  Does this appear to be the extent of     09:18

 6    the key records and materials you reviewed and you

 7    prepared to deal with the autopsy of Mr. Rucks?

 8        MR. POINTER:  Objection.  Vague and ambiguous.

 9    BY MR. BLECHMAN:

10        Q    You can answer.                                 09:18

11        A    When we prepared for the autopsy, I didn't

12    have the photos, obviously.  I just had the coroner's

13    investigative report.

14        Q    Right, okay.

15             Are there any other documents you prepared      09:19

16    that are not in front of us here related to the

17    autopsy of Mr. Rucks that you think are important to

18    your opinions, I should say?

19        MR. POINTER:  Objection.  Compound.

20        THE WITNESS:  No.                                    09:19

21    BY MR. BLECHMAN:

22        Q    All right.  So let's go through your autopsy

23    report, which is Exhibit 27.  And let's -- you can

24    double -- you can reference it with the one in front

25    of you, but I would like for you, as best you can, to   09:19
```

Page 10

```
 1    look at 27 so we're working off of the same document

 2    and there's no confusion.

 3              When was the reported death?

 4    A    It was reported to me June 25th of 2015.

 5    Q    And then when was the autopsy?              09:19

 6    A    June 29th of 2015.

 7    Q    And what information did you have prior to

 8    performing the autopsy on Mr. Rucks?

 9    A    The information that I had is in the

10    coroner's investigative report, which is attached to   09:20

11    the autopsy report.

12    Q    Okay.  So there's several pages of

13    typewritten documentation.  It looks like here it's

14    APD396 to 400.  Much of that information you had prior

15    to performing the autopsy?                    09:20

16    A    Yes.

17    Q    Obviously, if there's injuries in those

18    documents that postdate June 29th, 2015, you would not

19    have had -- seen that in these documents; is that

20    accurate?                                     09:20

21    A    Yes.

22    Q    So can you give me a general idea of what

23    information, basically, you had prior to performing

24    the autopsy on Mr. Rucks?

25    A    Mr. Rucks had called for police assistance.   09:21
```

Page 11

1   potentially, than heart blood?

2       A   Yes.

3       Q   Okay.  While you're looking at the toxicology

4   report, there was some positive findings; is that

5   correct?                                                09:30

6       A   Yes.

7       Q   There was methamphetamine found in his

8   peripheral blood?

9       A   Yes, there was.

10      Q   And the level was 340?                          09:30

11      A   Nanograms.

12      Q   Per milliliter?

13      A   Yes.

14      Q   Okay.  And was that a significant finding at

15  autopsy?                                                09:31

16      A   Yes.

17      MR. POINTER:  Objection.  Vague and ambiguous.

18  BY MR. BLECHMAN:

19      Q   How so?

20      A   I believe that Mr. Rucks died of what is       09:31

21  referred to as excited delirium.  And one of the main

22  causes of excited delirium is being under the

23  influence of methamphetamine, which he was.  So to me

24  it was very significant.  There are other causes of

25  excited delirium, but this is one of the main causes.   09:31

Page 17

1      Q    Before the tox results came back, it looks

2   like this report was issued several weeks after your

3   autopsy; is that correct?

4      A    Yes.

5      Q    Did you have suspicions or beliefs that          09:31

6   Mr. Rucks's death may have been excited delirium prior

7   to receiving the tox results?

8      A    Yes.

9      Q    In other words, were there other markers

10  noted at autopsy and from information you received for   09:32

11  the whole process that led you to believe this could

12  have been an excited delirium related death prior to

13  receiving the toxicology information?

14     A    Yes.

15     Q    There's also a positive finding for            09:32

16  amphetamine; is that correct?

17     A    Yes.

18     Q    And that was 37 nanograms per milliliter?

19     A    Yes.

20     Q    And amphetamine is a breakdown in the body of   09:32

21  methamphetamine; is that correct?

22     A    Yes.

23     Q    Do those two numbers have any significance as

24  you look at them together, the methamphetamine level

25  and the amphetamine level, per your expertise?          09:33

Page 18

1    Q    Was the high blood pressure or high

2    cholesterol consistent with the cardiac hypertrophy?

3    A    The enlarged heart could have -- probably was

4    caused by high blood pressure.  As far as the high

5    cholesterol, that didn't have much effect because          09:48

6    there was not much arterial sclerosis in his coronary

7    arteries.

8    Q    So, in other words, even though he might have

9    had high cholesterol, it seemed to be under control?

10   A    Well, I don't know if it was under control,          09:49

11   but it didn't have much of an effect on his heart.

12   Q    Got you, okay.

13        And then we'll talk about the abrasions and

14   contusions as we get into the guts of your report.

15   Your cause of death was, "Cardiopulmonary arrest while    09:49

16   in struggle with officers while under the influence of

17   methamphetamine (minutes)"; is that correct?

18   A    Yes.

19   Q    So to a layperson such as myself, is that

20   basically a heart attack while during the struggle        09:49

21   with officers while under the influence of

22   methamphetamine?

23   A    Not a heart attack.

24   Q    Okay.

25   A    His heart stopped beating and he stopped            09:49

                                                    Page 29

1    breathing while he was in a struggle with the officers

2    while he was under the influence of methamphetamine.

3    It's a -- I would say a descriptive cause of death.  I

4    usually don't like to put excited delirium because

5    some people do not recognize that term as a cause of        09:50

6    death.  I do, forensic pathologists do, but I don't

7    believe it's been universally accepted as a cause of

8    death.  So I usually give a descriptive cause of

9    death, as I did in this case, but this is -- to me

10   this is the same as excited delirium.                       09:50

11        Q    I understand.  So you didn't mention excited

12   delirium, per se, in your autopsy report; is that

13   correct?

14        A    Yes.

15        Q    But your cause of death description you          09:50

16   believe is, essentially, a description of what is also

17   known as excited delirium syndrome?

18        A    Yes.

19        Q    And you testified at the inquest that you

20   believe this death was as a result of excited delirium     09:51

21   syndrome; is that correct?

22        A    Yes.

23        Q    Okay.  So what is excited delirium syndrome

24   in general?

25        MR. POINTER:  Objection.  Vague.                      09:51

Page 30

```
 1            THE WITNESS:  It's a syndrome which involves
 2    death of someone while in a struggle, usually while in
 3    a struggle with police officers while they're under
 4    the influence of meth -- of drugs.  Usually it's
 5    cocaine or methamphetamine.  But I've had cases and      09:51
 6    there are cases described where people aren't on
 7    drugs.  And usually these are males.  They're
 8    usually -- I believe the average age is 36.  They
 9    often will have an enlarged heart, as he does.
10            And it's important that there's no other        09:52
11    cause of death that we find.  They usually exhibit a
12    very aggressive bizarre behavior.  They usually sweat
13    heavily, as he did.  They can have hallucinations.  I
14    don't know if he did or not.  But I believe he thought
15    people were trying to shoot him, which I don't believe  09:52
16    actually happened.
17            These are usually people -- it's usually not
18    their first time they used whatever drug it is,
19    cocaine or methamphetamine, but over time they have
20    had episodes of this in the past.  I don't know if he   09:53
21    was using this drug in the past, I don't know if he
22    did or not, but I would probably say he probably did,
23    but I don't know if that's true or not.  But usually
24    they have used it multiple times in the past, and
25    then, for whatever reason, the one time they use it,    09:53
```

                                                  Page 31

```
 1    they get into this behavior that causes them to have a

 2    run-in with the police, a struggle, and then a sudden

 3    cardiac arrest.

 4          Now, I believe if you look in the literature,

 5    only about 10 percent of people actually die that have   09:53

 6    this syndrome.  So everyone does not die from it.

 7    BY MR. BLECHMAN:

 8      Q   Can the weather have an impact on somebody

 9    who is experiencing those types of symptoms?

10      A   Usually it's warm weather.  And I believe it    09:54

11    was rather warm.  This was June.

12      Q   Yeah, there's been some testimony that it was

13    likely somewhere above the 90s at the time of the

14    struggle.

15      A   So he fit all --                                09:54

16      MR. POINTER:  Objection.  There's no question

17    pending.

18      MR. BLECHMAN:  It's okay, Doctor, you can finish

19    your answer.

20      MR. POINTER:  He made a statement.  I don't know    09:54

21    if there's any question.

22    BY MR. BLECHMAN:

23      Q   You were saying you believe he fit, can you

24    finish your answer?

25      A   He had a typical age, sex, use of drugs, he     09:54
```

Page 32

```
 1    had typical symptoms and behavior that are associated

 2    with this syndrome.

 3         Q    Warm weather was involved here; is that your

 4    understanding?

 5         A    Yes.                                          09:55

 6         Q    There was -- he was sweating heavily; is that

 7    correct, to your knowledge?

 8         A    Yes, one of the officers said he -- or more

 9    than one said he was sweating, yes.

10         Q    He was a male, correct?                       09:55

11         A    Yes.

12         Q    His age was 34.  And was that in the range of

13    where this is -- usually occurs in males?

14         A    Yes.

15         Q    So when the average age is 36, some people    09:55

16    are in their late 20s, some people are in their late

17    30s, that type of thing?

18         A    Yes.

19         Q    He had an enlarged heart that you found at

20    autopsy; is that correct?                               09:55

21         A    He did.

22         Q    So taking all of those factors, that's the

23    reason you came to the conclusion that the death of

24    Mr. Rucks was due to the excited delirium syndrome; is

25    that correct?                                           09:56
```

1        A    Yes, and the fact I found no other obvious

2   cause of death.

3        Q    Mr. Rucks was found -- or during the struggle

4   and at the time his death he was found to be wearing

5   tennis shoes, long pants, jeans, and some sort of        09:56

6   shirt.  In this warm weather, could that have an

7   impact on his body temperature, which could also have

8   been a factor in the excited delirium syndrome?

9        MR. POINTER:  Objection.  Calls for speculation,

10  beyond the witness's expertise.                          09:57

11       THE WITNESS:  Yeah, I don't think the clothing

12  had much of an effect on this.

13  BY MR. BLECHMAN:

14       Q    So at autopsy you didn't find any other

15  obvious signs of causes of his death other than the      09:57

16  excited delirium syndrome that you described in your

17  autopsy report as the cause of death?

18       A    That's correct.

19       Q    You noted the other significant condition as

20  "Left ventricular cardiac hypertrophy."  Why did you     09:57

21  feel like you needed to list that under other

22  significant condition as well?

23       A    Because people with enlarged hearts are more

24  likely to have a cardiac death.  As I said, most -- in

25  the literature, most of these people do have enlarged    09:58

Page 34

```
 1   BY MR. BLECHMAN:

 2        Q    In other words, no cracked skull, no hematoma

 3   of the brain, hemorrhaging, any of those findings

 4   positive?

 5        A    No.                                            09:59

 6        Q    What is thermoregulation?  Do you know what

 7   that is?

 8        A    That has to do with regulation of body

 9   temperature.

10        Q    The first part of your autopsy, do you look   10:00

11   at whether or not -- you know, do you do -- do you do

12   cellular analysis of the cells to see if there's any

13   products in the cells that may have given indication

14   of cause of death or anything like that?

15        A    Well, I did microscopic examination of the    10:00

16   organs to see if there may have been a cause of death

17   there.  I did that.

18        Q    And was there any significant findings in

19   that regard?

20        A    No.                                            10:01

21        Q    Generally, if somebody such as Mr. Rucks is

22   involved in a struggle, with some of these other

23   factors that you talked about, if the heart stops

24   beating, then tell me about what occurs with the

25   individual that then leads to unconsciousness and      10:01
```

Page 36

```
 1        A    Yes.

 2        Q    And what does that mean, cutaneous?

 3        A    Skin, over the skin surface.

 4        Q    But, again, none of those abrasions and

 5   contusions were associated in any way with his cause    10:05

 6   of death; is that accurate?

 7        A    Yes.

 8        Q    So even if he had been hit with a baton or a

 9   flashlight that led to an abrasion or contusion, it's

10   your opinion that that did not cause his death,          10:05

11   correct?

12        A    Yes.

13        Q    And your internal examination did not find

14   anything consistent leading to any other cause of

15   death other than the heart hypertrophy; is that         10:05

16   correct?

17        A    Yes.

18        Q    It's true that Mr. Rucks didn't have any

19   injuries of his neck, either externally or internally,

20   that were significant, correct?                          10:06

21        MR. POINTER:  Objection.  Vague and ambiguous.

22        THE WITNESS:  Yes, there were no injuries to his

23   neck.

24   BY MR. BLECHMAN:

25        Q    On page 3 of your report, which is APD403,     10:06
```

Page 39

1    you have a specific internal examination neck section;

2    is that correct?

3        A    Yes.

4        Q    And you said that there were no abnormalities

5    noted in the anterior strap muscles, hyoid bone,                10:06

6    laryngeal cartilages?

7        A    Cartilages.

8        Q    Or cervical vertebral column; is that what

9    you wrote?

10       A    Yes, there were no internal injuries to his        10:06

11   neck.

12       Q    And why was that significant to you here?

13       A    Well, if he been strangled, for example,

14   there would have been internal injuries on his neck.

15       Q    There's some allegations in this case that        10:07

16   Mr. Rucks was asphyxiated by the officers which caused

17   his death.  Did you see any specific evidence in your

18   autopsy that supported that he was asphyxiated, which

19   led to his death?

20       A    Asphyxiated by what means?  I need to know        10:07

21   that before I can answer.  Asphyxia is just a lack of

22   oxygen.

23       Q    So asphyxiated with the position he was in

24   and placing some body weight on him, I believe those

25   are the plaintiff's allegations.  There was no          10:08

Page 40

```
 1    specific allegation that he was strangled, so to

 2    speak, with any type of ligature or carotid hold or

 3    choke hold or anything like that.  It's more of a

 4    positional and a body weight, I guess, type argument.

 5        A    Okay.  No, I do not believe there was any      10:08

 6    evidence of that.  And I think it's been, in my

 7    opinion, shown in the literature that that does not

 8    play a role in these deaths, even if people are on the

 9    person's back.  I don't -- I do not think that played

10    a role in this death.                                   10:08

11        Q    When I say -- so you're saying that the --

12    there's other studies that have come out over the

13    years that have debunked the positional asphyxia type

14    of claim?

15        A    Yes.  And I do have those references if you    10:09

16    need them.

17        Q    And where would you be able to look for

18    those?  Is that something in your office here or

19    something to that effect?

20        A    I may have them at home.  I'm not sure I have  10:09

21    them here in the office.  There's a good paper by

22    Karch, K-A-R-C-H, in the last year or two that, in my

23    opinion, answers that question.

24        Q    So just so I'm clear, you said that any --

25    well, you said "Did not play a role here," what did    10:09
```

Page 41

1  you mean by that?

2      A   I don't believe he died of asphyxia due to

3  body positioning, being prone, for example.  I don't

4  think that caused his death.

5      Q   Would you have -- would you expect to find   10:10

6  certain signs or markers at autopsy that may have

7  indicated positional asphyxia or asphyxia was a cause

8  of death?

9      A   You may not find any specific findings on

10  autopsy.  Sometimes you may see hemorrhages in the   10:10

11  eyes, but they were not present, but you don't always

12  see that in positional asphyxia.  I just don't believe

13  it played a role in his death.

14      Q   Hemorrhages, is that also referred to as

15  petechia?   10:11

16      A   Yes.

17      Q   Was there any significant petechia findings

18  in any parts of his body that were significant?

19      A   No.

20      Q   Based upon your training and experience, if a   10:11

21  person is claiming that they can't breathe and they

22  can speak, are they still breathing?

23      A   Yes.

24      Q   Does it take some time period for somebody to

25  be asphyxiated?  In other words, if the oxygen supply   10:11

Page 42

```
 1        A    Yes.

 2        Q    Was that significant to you in these

 3   findings?

 4        A    Only in that there was no injury there that

 5   was significant.   There was no neck injury.          10:27

 6        Q    Based upon your experience, when there is

 7   injury to the larynx or the trachea or the muscles,

 8   you know, around the neck, what could that signify to

 9   you?

10        A    Well, that could either be a strangulation or   10:28

11   it could be a blunt force injury.

12        Q    And in Mr. Rucks, there was no evidence of

13   strangulation to his neck or any blunt force injury to

14   his neck; is that correct?

15        A    Yes.                                        10:28

16        Q    You also say that the -- this -- the third

17   sentence under the respiratory system, when you're

18   talking about the tracheobronchial tree, "Followed its

19   normal anatomic pathway and contained a slight amount

20   of blood," what was relevant about that finding?      10:28

21        A    Just there was no blockage of the

22   tracheobronchial tree.

23        Q    Was there another indicator of the fact that

24   there was no strangulation type issues here?

25        A    Well, no, you would not have -- well, he had   10:29
```

Page 54

```
 1    a history of asthma, and if he had what is called

 2    status asthmaticus, in other words, dying from his

 3    asthma, then there would have been a lot of mucus

 4    plugging of the tracheobronchial tree, and I didn't

 5    see any evidence of that.  So in that respect, it was    10:29

 6    significant.

 7         Q    And then you get into the gastrointestinal

 8    tract section.  And, basically, the tongue, esophagus,

 9    stomach, small intestine and colon were unremarkable;

10    is that correct?                                         10:30

11         A    Yes.

12         Q    And the stomach was empty; is that correct?

13         A    Yes.

14         Q    There's been some allegations in this case

15    that Mr. Rucks had some dirt or debris in his nose in    10:30

16    some of the photographs and/or dirt and debris in or

17    around his mouth area.  My question to you is, did you

18    see any findings -- did you make any findings about

19    any dirt or debris in either of those orifices being a

20    cause of Mr. Rucks' death?                               10:30

21         A    No, I didn't.

22         Q    Was there any significant findings about any

23    dirt or debris around his nose or mouth that you found

24    on autopsy?

25         A    No, there was none at autopsy.                 10:30
```

Page 55

1   by Mr. Rucks' face.

2          A    68.

3          Q    In this photograph you can see some of the

4   abrasions to his left forehead area; is that correct?

5          A    Yes.                                          10:47

6          Q    And this has been a photograph, I believe,

7   shown to officers in this case pointing out, by

8   plaintiff's counsel, some of what looks to be dirt,

9   grass around the mouth and nose area.  Again, did you

10  make any findings at autopsy about any dirt or grass     10:47

11  or other debris in the mouth or the nose that had

12  anything to do with Mr. Rucks' death?

13         A    No, I did not.

14         Q    If Mr. Rucks had ingested dirt or debris in

15  through his nose or his mouth that would have            10:48

16  contributed to his death, would you have expected to

17  find evidence of that, for example, in his esophagus

18  or trachea?

19         A    Possibly, yes.

20         Q    In his lung tissue or his lungs?              10:48

21         A    Probably not in his lungs.

22         Q    Where else would you potentially have found

23  that dirt and debris at autopsy?

24         A    Well, in his mouth.

25         Q    How about internally, in any of his systems,  10:48

                                                    Page 61

1    potentially would you see dirt and debris in the

2    stomach?

3        A    If he had swallowed it, yes.

4        Q    All right.  In some of the autopsy photos we

5    see some cut jeans and at least one white tennis shoe      10:49

6    on his left foot.  Is that your understanding as to

7    some of the clothing Mr. Rucks was wearing at the time

8    of the incident?

9        A    I would assume he was wearing that at the

10   time of the incident, yes.                                 10:49

11       Q    Okay.  There was also some -- an abrasion

12   behind his right ear that was found.  Did you have any

13   -- did you contribute any significance to the abrasion

14   behind the right ear?

15       A    It's a blunt force injury.  I can't say what     10:50

16   caused it, something during the struggle most likely.

17       Q    All right.  Now, in autopsy photo 46 of

18   Exhibit 30 there's a black glove and it looks like

19   some debris in the hand of -- is that your hand, by

20   the way?                                                   10:50

21       A    No.

22       Q    You would have been wearing different colored

23   gloves, I take it?

24       A    Yes.

25       Q    Do you know what this material is in the        10:51

                                                      Page 62

```
 1    speculation.  I take it you would agree, because

 2    you're not a toxicologist and this is not your

 3    specialty, correct?

 4         MR. BLECHMAN:  Argumentative, asked and answered.

 5         THE WITNESS:  I would agree with what?          11:01

 6    BY MR. POINTER:

 7         Q    That you're not a toxicologist and this is

 8    beyond your degree of specialization?

 9         MR. BLECHMAN:  Same objection.

10    BY MR. POINTER:                                       11:01

11         Q    You're not an expert?

12         A    I am not a toxicologist, that's correct.

13         Q    And this is not something that you do in

14    terms of determining the effects of a drug on a

15    person's behavior, correct?  It's not what you do as a  11:01

16    pathologist, right?

17         A    Well, I -- in this case, I used the

18    toxicology to form my opinion as to the cause of

19    death.

20         Q    Understood.                                 11:02

21              Cause of death is different from how a person

22    is going to behave under the influence of drugs,

23    correct?

24         A    Yes.  My job is to give the cause of death.

25         Q    So determining whether or not a drug causes a  11:02
```

Page 71

Landi Court Reporters, A Veritext Company
408-279-8590

1    particular type of affect on a person, meaning

2    violent, aggressive, or irrational, is beyond the

3    scope of what you do as a pathologist, correct?

4        A    No.  He exhibited violent, aggressive

5    behavior.  He had methamphetamine in his blood, and at   11:02

6    a level that has been associated with this type of

7    behavior.  I think I -- that's my opinion.

8        Q    Sure.  And as a pathologist, you're to

9    determine -- one of the things you do is determine the

10   cause of death, right?                                   11:02

11       A    Yes.

12       Q    Was the violent and aggressive behavior that

13   you're talking about his cause of death?

14       A    His cause of death, it played a part in his

15   cause of death.  It led me to the opinion that he died   11:03

16   of the excited delirium syndrome because that's

17   characteristic of that syndrome.  So it was important

18   for me to have that information to determine cause of

19   death.

20       Q    So if I heard you correctly, you're saying      11:03

21   that the violent and aggressive behavior that you're

22   attributing to Mr. Rucks was a contributing factor to

23   causing his death, correct?

24       A    Yes, it was.

25       Q    All right.  As well as the interaction that     11:03

Page 72

Landi Court Reporters, A Veritext Company
408-279-8590

```
1        A    I have no memory of this autopsy at all.

2        Q    Okay.  So you can't sit here today and say

3   that that actually took place, that they told you how

4   long the struggle took place, correct?

5        A    Correct.                                    11:07

6        Q    You have no notes wherever -- strike that.

7             And you have no notes whatsoever indicating

8   that they told you how long the struggle took place,

9   correct?

10       A    Correct.                                    11:07

11       MR. BLECHMAN:  Assumed facts, lacks foundation.

12   BY MR. POINTER:

13       Q    So is the length of the struggle something

14   that you find significant as it relates to determining

15   the cause of death?                                  11:07

16       A    The length per se, no.

17       Q    So whether the struggle took 30 seconds or 10

18   minutes, that doesn't factor into your analysis of

19   rendering a cause of death?

20       A    No.                                         11:07

21       Q    So if a person's breathing is impeded for 30

22   seconds versus 10 minutes, that doesn't factor into

23   determining a cause of death?

24       A    Well, I don't believe his breathing was

25   impeded.                                             11:07
```

Page 76

```
 1         MR. BLECHMAN:  Hold on a second.  Incomplete

 2    hypothetical, lacks foundation.

 3    BY MR. POINTER:

 4         Q   And it was a hypothetical.  I'm just asking

 5    you, would that --                                      11:07

 6         A   Well, if you're breathing is -- yes, it would

 7    make a difference if it was 30 seconds or for 10

 8    minutes.  If you're breathing was impeded, yes, it

 9    would make a difference.

10         Q   And so you have no information, as you sit    11:08

11    here today, as it relates to how long -- or strike

12    that.

13         You have no information, as you sit here

14    today, as to whether or not Mr. Rucks' breathing was

15    actually impaired during the course of his interaction  11:08

16    with the officers, correct?

17         MR. BLECHMAN:  Vague and ambiguous, lacks

18    foundation.

19         You can respond.

20         THE WITNESS:  I have seen nothing that indicates   11:08

21    his breathing was impaired.

22    BY MR. POINTER:

23         Q   And they didn't tell you that it was either,

24    correct?  And by "they," the officers.

25         MR. BLECHMAN:  Lacks foundation that he talked to  11:08
```

Page 77

1       A    Yes.

2       MR. BLECHMAN:  Lacks foundation.  Belated

3    objection.  Lacks foundation, misstates the record,

4    assumes facts not in evidence.

5    BY MR. POINTER:                                    11:09

6       Q    Well, you have a pile of papers in front of

7    you.  Is there anything in these papers that you

8    relied upon or that you were advised that said that

9    Mr. Rucks had difficulty breathing?

10      A    Well, once he had his cardiopulmonary arrest, 11:10

11   he obviously had difficulty breathing, but prior to

12   that, there's nothing that I've read that indicated he

13   did have trouble breathing.

14      Q    Likewise, no communication that's been

15   documented in your file or any of the documents that   11:10

16   we looked at today indicates that the officers either

17   told the coroner's investigator or you that Mr. Rucks

18   complained about having difficulty breathing?

19      A    I do believe I read one of the -- in the

20   inquest, one of the officers said a witness said that  11:10

21   he complained of -- that he was short of breath.

22      Q    Okay.  Now, prior to the inquest, you hadn't

23   received that information, correct?

24      A    Well, as I said, I don't recall the

25   information I received from the people that attended    11:10

                                                  Page 79

1    the autopsy.

2        Q   Okay.

3        A   So I don't know if I did or not.

4        Q   Okay.  Well, asked another way, there's

5    nothing in your file, whether the coroner's report      11:11

6    and/or the coroner's investigative report, that

7    indicates that Mr. Rucks complained about having

8    difficulty breathing while he was interacting with the

9    officers, correct?

10       A   Yes.                                             11:11

11       Q   So that's not a factor that you had to

12   consider as you performed your autopsy and arrived at

13   a cause of death, right?

14       A   Yes.

15       Q   Is that something that is significant that      11:11

16   you would have liked to have known while you are

17   performing your autopsy?

18       MR. BLECHMAN:  Assumes facts, lacks foundation.

19           You can respond.

20       THE WITNESS:  Well, often these people do say "I     11:11

21   can't breathe," but the fact that they're saying it

22   means that they are breathing.  So it's not that

23   uncharacteristic of people that die of this excited

24   delirium to complain of I can't breathe, so it would

25   not change my opinion if he had said that.  And the      11:12

1    only documentation I have is that a witness said that.

2    Now, I don't know how reliable that witness was.

3    BY MR. POINTER:

4        Q   Do you place the witness's credibility below

5    that of an officer?                                    11:12

6        A   I don't know who the witness was.

7        Q   Well, the fact that you knew the officers,

8    does that factor into whether or not you believe them?

9        A   Well, they were under oath when they -- the

10   witness was not under oath.  So I would say the        11:12

11   officers' testimony was, in this case, was more

12   reliable than the witness who made that comment.

13       Q   To the officers?

14       A   To the officers.

15       Q   And so the fact that the witness was not     11:12

16   under oath to you means that the witness is less

17   reliable than the officer?

18       MR. BLECHMAN:  Misstates the witness's testimony.

19       THE WITNESS:  Yes.

20   BY MR. POINTER:                                        11:12

21       Q   Now, you mentioned that when a person says

22   they can't breath, they're actually breathing,

23   correct?

24       A   Yes.

25       Q   Them saying they can't breathe may actually   11:13

Page 81

1  be them voicing the fact that their breathing is

2  restricted, correct?

3      MR. BLECHMAN:  Incomplete hypothetical.

4      THE WITNESS:  It could be, but, as I said, when

5  they make that statement, they are breathing.        11:13

6  BY MR. POINTER:

7      Q   But, ultimately, Mr. Rucks wound up not

8  breathing, correct?

9      A   Yes.

10     Q   So him saying that "I cannot breathe" or "I'm   11:13

11 having difficulty breathing" was actually based upon

12 the facts here that are indicative of the fact that

13 his breathing may have been impaired, correct?

14     MR. BLECHMAN:  Calls for speculation, lacks

15 foundation, incomplete hypothetical, assumes facts not  11:13

16 in evidence.

17         You can respond.

18     THE WITNESS:  To me it does not indicate his

19 breathing was impaired.

20 BY MR. POINTER:                                        11:13

21     Q   I'll say it may be impaired.

22     A   Well, it could have been impaired, I guess.

23 But just because he said it, doesn't mean that it was

24 impaired.

25     Q   Similar to the officers, right, just because   11:13

                                            Page 82

1    can't remember a specific case study.  But what I'm

2    describing is not something that sounds beyond the

3    realm of reason, correct?

4        A    It's possible, yes.

5        Q    That a person can say "cannot breathe," that      11:15

6    that's actually true, that they're expressing the fact

7    that their breathing is being impeded and they

8    ultimately wind up dying as a result of not being able

9    to get oxygen, correct?

10       MR. BLECHMAN:  Incomplete hypothetical.               11:15

11       THE WITNESS:  Yes, but he could have said that

12   because he was about to go into cardiopulmonary

13   arrest.  It does not necessarily mean that his

14   breathing was restricted in some manner.

15   BY MR. POINTER:                                          11:15

16       Q    It does not necessarily.  But under the range

17   of possibilities, you have to say that it could have

18   actually been true, correct, that his breathing was

19   restricted and he was merely voicing the fact that

20   that's what he was feeling?                              11:15

21       A    Well, from all the facts that I know in this

22   case, his breathing was not restricted.  I see no

23   evidence that his breathing was restricted.

24       Q    What type of evidence would you be looking

25   for to substantiate that?                                11:16

                                                        Page 84

```
 1        A    Well, if he had some chest injury that

 2   prevented him from breathing, but he didn't have any

 3   chest injury.  If his airways were blocked, but his

 4   airway were not blocked.

 5        Q    Does a person necessarily have to have a          11:16

 6   chest injury in order for their diaphragm to be

 7   restricted, which then would have caused difficulty

 8   breathing?

 9        A    No.  You can have injuries to your spinal

10   cord and your neck, but he didn't have those.               11:16

11        Q    All right.  And if a person's diaphragm was

12   kept from functioning normally, which then would

13   impede their breathing, would that necessarily be

14   shown by way of a chest injury, like would it -- is it

15   required to have a chest injury in order to prove that      11:17

16   a person's diaphragm was impeded from functioning

17   normally?

18        A    No.

19        Q    So a person can have their breathing impeded

20   and not have a chest injury, correct?                       11:17

21        A    Yes.  You asked me what I might see at

22   autopsy in a chest injury of someone that is having

23   trouble breathing.

24        Q    Is it fair to say that a person can have

25   their diaphragm impeded from functioning normally,          11:17
```

Page 85

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

          That the foregoing proceedings were taken

4     before me at the time and place herein set forth; that

5     any witnesses in the foregoing proceedings, prior to

6     testifying, were administered an oath; that a record

7     of the proceedings was made by me using machine

8     shorthand which was thereafter transcribed under my

9     direction; that the foregoing transcript is a true

10    record of the testimony given.

11          Further, that if the foregoing pertains to

12    the original transcript of a deposition in a Federal

13    Case, before completion of the proceedings, review of

14    the transcript [ ] was [ ] was not requested.

15          I further certify I am neither financially

16    interested in the action nor a relative or employee

17    of any attorney or any party to this action.

18          IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20    Dated:  October 24, 2017

21

22

23

24
      _____

      JODI L. BOSETTI

25    CSR No. 11316, RPR

                                        Page 143

# EXHIBIT H

DEPARTMENTAL REGULATIONS
ΝTIOCH POLICE DEPARTMENT



POLICY........................16
EFFECTIVE DATE: 10/87
REVISION DATES: 10/95
05/00
12/06
03/10

## USE OF FORCE

I.   **POLICY**

It is the policy of this department that our officers use objectively reasonable force and authority when making an arrest; preventing an escape of a suspected offender; overcoming resistance and maintaining order.

**Limitation of Policy**

This order is for internal use only and does not increase an officer's civil or criminal liability in any way.  It shall not be construed as the creation of a higher standard of safety or care in an evidentiary sense with respect to third-party claims.  Violations of this order, except those of a criminal nature, can only form the basis of complaint and/or disciplinary action by this department and only in an administrative setting.

II.  **PURPOSE**

Occasionally, police officers must use force to maintain order, enforce the law, and protect life and property.  The intent of this policy is to introduce the concept of a use-of-force continuum.  It is intended to provide direction to officers meeting resistance, but it is not intended to allow any suspect/subject to be the first to exercise force to gain an advantage in a confrontation.  Furthermore, this policy should not be interpreted to mean an officer is required to engage in hand-to-hand combat before resorting to a level of force that will most quickly, humanely and safely bring a suspect/subject under physical control.

III. **PROCEDURE**

A.   Introduction:

Definitions

1.   Less than lethal force – force unlikely, when properly used to result in serious physical injury or death.

2.   Lethal force – force likely to cause serious physical injury or death.

APD-413

3. Use of force continuum – definition of force options available to officers in deciding what level of force is appropriate based on the given circumstance.

4. Objectively Reasonable Force - Objectively reasonable force is that level of force which is appropriate when analyzed from the perspective of a reasonable officer possessing the same information and faced with the same circumstances as the officer who has actually used force. Objectively reasonable force is not judged with hindsight, and will take into account, where appropriate, the fact that officers must make rapid decisions regarding the amount of force to use in tense, uncertain, and rapidly evolving situations. Important factors to be considered when deciding how much force can be used to apprehend or subdue a subject include, but are not limited to, the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officers or others, and whether the subject is actively resisting arrest or attempting to evade arrest by flight.

B. The Law:

The California Penal Code gives police officers the authority to use force as necessary.

**835PC -** how an arrest is made and what restraint is allowed.  An arrest is made by an actual restraint of the person or by submission to the custody of an officer.  The person arrested may be subjected to such restraints as is reasonable for his/her arrest and detention.

**835aPC -** reasonable force to effect arrest or prevent escape is permissible.  A peace officer, who has reasonable cause to believe that the person to be arrested has committed a public offense, may use reasonable force to affect the arrest, to prevent escape, or to overcome resistance.

**836.5(b)PC -** ....no such officer or employee shall be deemed an aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or overcome resistance.

**843PC -** what force may be used.  When the arrest is being made by an officer under the authority of a warrant, after information of the intention to make the arrest, if the person to be arrested either flees or forcibly resists, the officer may use all necessary means to effect the arrest.

**196PC –** justifiable homicide by public officers.  Homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance either:

1. In obedience to any judgement of a competent court.

2.  When necessarily committed in overcoming actual resistance to the execution of some legal process or in the discharge of any other legal duty.

3.  When necessarily committed in retaking felons who are fleeing from justice or resisting such arrest.

C.  Guidelines in Situation-Based Use of Force Continuum:

The use-of-force continuum is designed to provide an overview of the force options available to the officer. It is an instrument that attempts to embody the dynamics of a confrontation.

Building flexibility into an officer's determination of the appropriate use of force is essential. The standard of evaluating an officer's use of force is the reasonableness of the use of force under the facts and circumstances known to the officer at the time. Thus, each incident must be evaluated relative to the particular situation.

An officer need not attempt to control an individual by utilizing the lowest minimum force option when reason would dictate otherwise and the officer can articulate that a higher force option is objectively reasonable. The force option selected by the officer is determined by facts, circumstances and resistance encountered.

Examples of factors that may affect an officer's force option include, but are not limited to, the following:

1.  Officer/Subject factors, i.e., age, size, relative strength, skill level, injury/exhaustion, number of officers versus number of subjects.

2.  Influence of drugs or alcohol.

3.  Proximity of weapons.

4.  Availability of other options.

5.  Seriousness of the offense in question.

6.  Suspect's degree of aggression/cooperation.

7.  Knowledge of the suspect.

8.  Other exigent circumstances.

APD-415

POLICY NO. 16

D.   Officer Response Options:

1.   Professional presence and verbalization option:  providing verbal directions and commands to the subject.

2.   Restraining option:  includes an officer utilizing his/her hands to control the subject.  Examples include the use of firm grip, escort position, or immobilizing the subject.  Also included is the application of temporary restraining devices, such as, handcuffs and leg restraints.

3.   Compliance technique option:  includes joint manipulation, pressure point application, takedown techniques and the use of intermediate weapons in a control-type configuration. **section III.D.4 of the Use of Force Policy**

4.   Intermediate force option:  includes Electronic Control Device (ECD), chemical agents, such as, oleoresin capsicum-based products; Carotid Control restraint; impact weapons in an impact mode; use of the officer's body parts, such as, hands, feet elbows and knees to strike the subject; and use of a police trained dog (K-9).

5.   Lethal force option:  includes the use of a firearm or any force, which may result in death or serious physical harm.

In using the use-of-force continuum, it is imperative to remember once the force option used is successful in gaining compliance, officers should re-evaluate the force necessary to complete their task.  Just as an officer may immediately increase the force option when necessary, the officer must be just as cognizant of decreasing the force option when appropriate.

## IV.   REPORTING USE OF FORCE INCIDENTS

A.   Reportable Force Defined:

An on-duty or off-duty incident in which officers, pursuant to their official capacity, use the intermediate level of force (or above); or any incident in which an injury or complaint of injury occurs during the course of contact with the subject shall be reported.

APD-416

B.    Officer Responsibilities:

Officers using reportable force shall:

1.    Obtain medical assistance for subjects who have suffered injuries; complain of injury; or who have been rendered unconscious.

2.    Promptly notify their supervisor or the on-duty field supervisor, if his/her supervisor is not on duty, unless exigent circumstances delay the notification.  Once the exigent circumstances have been resolved, then notification shall be made.

3.    Officers observing use of reportable force, who do not believe the spirit and intent of the reporting requirements are being met, shall advise his/her immediate supervisor.

C.    Supervisor's Responsibilities:

When the supervisor has been notified of a reportable force incident, the supervisor shall:

1.    Ensure the involved officer(s) have completed the above responsibilities.

2.    Ensure the case is thoroughly investigated, documented and follows department procedures and guidelines.

3.    Prepare a memorandum to the Field Services Lieutenant, documenting the nature of incident and any injuries to officers, suspects and citizens.  If the supervisor is also assuming the duties of the watch commander, the supervisor shall also assume the initial reporting requirements of the watch commander.

D.    Watch Commander Responsibilities:

1.    Ensure the supervisor has completed the aforementioned responsibilities.

2.    Complete an after action report by the conclusion of the shift and forward the report to the division commander for review.

APD-417

E.     Department Responsibility:

In every reportable force incident, the department shall:

1.     Have the division commander, or designee, review the incident and initiate any additional action deemed necessary.  If necessary, the Chief of Police shall be notified of the incident and the status of the investigation.

2.     If any investigation is deemed necessary, the division commander shall review all requested and required information and prepare a memorandum of action taken by the involved parties and/or any recommendations to the Chief of Police for final disposition.


JIM HYDE
CHIEF OF POLICE

APD-418