UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

C.R., et al.,

        Plaintiffs,

v.

CITY OF ANTIOCH, et al.,

        Defendants.

Case No. 16-cv-03742-JST

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: ECF No. 50

Before the Court is Defendants' motion for summary judgment. ECF No. 50. The Court will grant the motion in part and deny it in part.

## I. BACKGROUND

Rakeem Rucks died after a June 10, 2015 interaction with City of Antioch police officers. His mother and children bring this suit alleging violations of the Fourth and Fourteenth Amendments and various state laws.

Many of the facts are undisputed. Defendant Officers Casey Brogdon and Chris Kidd responded to a 911 call from a male, later determined to be Rucks, reporting that people were chasing and trying to shoot him. Although the location was initially vague, dispatch subsequently directed the officers to the Delta Pines apartment complex and informed them that the caller had mentioned apartment 160.

Brogdon and Kidd found the door to apartment 160 to be open, with a broken door jamb. They did not see anyone in the apartment, nor did it appear that the contents of the apartment had been disturbed. Outside the apartment, they spoke with neighbors, who told them that the 911 caller was the person who broke down the door, that he was not being chased, and that he was high on drugs.

Lawrence Pernell, the resident of apartment 160, arrived on the scene and confirmed that he did not see anything missing from his apartment. Unidentified witnesses told Pernell that Rucks was the person who broke the door of his apartment. Pernell identified Rucks to Brodgon and Kidd when they saw Rucks at the top of a stairwell in another building of the same apartment complex.

Kidd recognized Rucks from a previous interaction, a year and half or two years prior, in which he witnessed a different officer pursue Rucks on foot. During that pursuit, Rucks stopped and turned to face the officer, appearing ready to fight. The officer then used force to take Rucks to the ground and subsequently arrested him.

Brogdon and Kidd asked Rucks to come downstairs to speak with them. Rucks complied, and Brogdon handcuffed Rucks, with his hands behind his back, without incident. Based on Rucks's appearance, both officers believed that he was under the influence of drugs.

The officers planned to detain Rucks in Brogdon's patrol car while they continued to investigate. Brogdon was walking with Rucks, while Kidd and Pernell followed. Rucks initially was responsive to questions but subsequently became increasingly "aggressive," according to Brogdon, ECF No. 50-1 at 45, and "agitated," according to Pernell, ECF No. 61-3 at 6.[1] Brogdon testified that Rucks "was pulling aways [sic] from me and trying to turn around and face me." ECF No. 50-1 at 43. Brogdon tried to pull Rucks to the ground by the shoulder, but he was unable to do so. Kidd then performed a leg sweep, and Rucks landed on the ground, in an area with grass and dirt.

---

[1] Defendants object to the Court's consideration of deposition transcripts submitted by Plaintiffs on grounds that "Plaintiffs failed to attach any certification by any Court reporter, certifying the witnesses were sworn and that the pages are true and correct versions of the record." ECF No. 66 at 19. However, the deposition transcripts submitted with Plaintiffs' amended opposition include the required certifications. ECF No. 61-2 at 48, 99; ECF No. 61-3 at 35, 56; ECF 61-4 at 56; see ECF No. 59 (order striking original opposition for failure to comply with Civil Local Rules and setting deadline for filing amended opposition). Although the transcripts submitted with Plaintiffs' original opposition did not have the certifications, the Court finds no prejudice to considering Plaintiffs' submitted deposition transcripts, which now include the proper certifications. Defendants had an opportunity to reply to the amended opposition on its merits. In addition, they rely on the same deposition transcripts, including some of the same testimony, relied on by Plaintiffs.

Rucks continued to move around, even though he was handcuffed and on his stomach, with his face on the ground but pointing to the side. The officers testified that Rucks was reaching at Kidd's duty belt, which contained tools and weapons. Kidd placed Rucks into a figure-four leg hold, and Brogdon held down Rucks's upper body. At one point, Brogdon also pulled Rucks's hands towards his head so that Kidd's duty belt would be out of reach. The record is unclear whether Brogdon used only his upper body to hold Rucks down, or whether Brodgon ever held his knee against Rucks's jaw and neck areas and, if so, for how long. The officers told Rucks to calm down and that they were not trying to hurt him.

Defendant Corporal Rick Smith responded to the scene while Brogdon, Kidd, and Rucks were on the ground. He determined that Rucks should be placed in a WRAP device, a type of body restraint. He did not have one in his vehicle, so he called another officer to respond to the scene with a WRAP. Smith observed that Rucks was "surprisingly able to lift [Kidd] up in the air off that hold, basically with one leg." ECF No. 50-3 at 9. He ran over to assist Brogdon and Kidd, and he joined Brogdon in trying to hold down Rucks's upper body. He also tried to calm Rucks by calling him "by his first name and trying to see if I can establish a rapport," saying, "'Calm down. We're not here to hurt you.'" Id. at 12, 14. At some point, Rucks calmed down "[d]ramatically," "stopped bucking around, stopped trying to kick Officer Kidd off," and he made eye contact with Smith. Id. at 12-14.

As Rucks's legs were being placed in the WRAP, Smith "noticed that something's not right." Id. at 20. He directed the officers to roll Rucks over, and Smith could find no pulse. Fire personnel arrived around the same time, and an ambulance arrived shortly thereafter.

Rucks was pronounced dead later that day. An autopsy performed four days after his death concluded that the cause of death was, "Cardiopulmonary arrest while in struggle with officers while under the influence of methamphetamine (minutes)." ECF No. 50-3 at 40. Rucks's blood tested positive for methamphetamine, at a level of 340 nanograms per milliliter.

The parties dispute whether Rucks expressed difficulty breathing during his encounter with Defendants. Pernell testified that he heard Rucks say at some point while he was on the ground, "Get me up out of the dirt. I'm breathing dirt. It's hard to breathe." ECF No. 61-3 at 14. He

recalled one officer "ma[king] a comment like, if you would quit agitating and be still we'll gladly pick you up out [of] the dirt, or something of that nature." Id. When asked whether "it sound[ed] like [Rucks] was heaving, like he was having trouble catching his breath," Pernell responded, "Just more out of breath than anything."[2] ECF No. 50-2 at 68. The officers testified that they never heard Rucks say he could not breathe. Smith also testified that Rucks's breathing was not any different from what he would expect of "someone in a struggle. . . . My officers were breathing heavy. I was breathing heavy because we're struggling with a gentleman that's – I believe he was almost bigger than me and he was abnormally strong." ECF No. 50-3 at 18.

Defendants now move for summary judgment on all claims.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if there is sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the court must draw "all justifiable inferences" in the nonmoving party's favor and may not weigh evidence or make credibility determinations. Id. at 255.

Where the party moving for summary judgment would bear the burden of proof at trial, that party "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire &

---

[2] Plaintiffs also cite an audio interview with Andral Hill as evidence that Rucks said that he could not breathe. ECF No. 61 at 9. The cited evidence appears to be an audio interview with a police detective. The audio recording has not been authenticated, and the Court therefore cannot consider it at summary judgment. Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002). In addition, Hill's statements do not appear to have been made under oath.

4

United States District Court
Northern District of California

Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party satisfies its initial burden of production, the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists. Id. at 1102-03. If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## III. DISCUSSION

### A. Fourth Amendment Claim

Plaintiffs' Fourth Amendment claim is based on their contention that Defendants used unreasonable force on Rucks after he was already handcuffed. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (internal quotation marks and citations omitted). This analysis "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. These factors "are not exclusive," and courts must "examine the totality of the circumstances." Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

The Ninth Circuit has "held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. This is because police misconduct cases almost always turn on a jury's credibility determinations." Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002) (citation omitted). Additionally, cases where "the victim of alleged excessive force has died pose a particularly difficult problem in assessing whether the police acted reasonably, because the witness most likely to contradict the officers' story is unable to testify." Gregory v. County of Maui, 523 F.3d 1103, 1107 (9th Cir. 2008) (internal quotation marks, alterations, and citation omitted).

Two Ninth Circuit cases are particularly relevant to the Court's analysis of the facts presented by this case. First, in Drummond ex rel. Drummond v. City of Anaheim, the Ninth Circuit held that the defendant "officers – indeed, any reasonable person – should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." 343 F.3d 1052, 1059 (9th Cir. 2003). In Drummond, witnesses testified that the officers put their knees and body weight on Drummond's neck and back. Id. at 1054. Five years later, the Ninth Circuit held that officers' use of force to restrain an individual who threatened officers with a pen was reasonable and not excessive, even though the individual "repeatedly shouted that he could not breathe, which [one officer] told him was impossible because he could talk." Gregory, 523 F.3d at 1105-07. The court distinguished Drummond in part because the officers "ceased using force once Gregory was handcuffed." Id. at 1109 (citing Drummond, 343 F.3d at 1057-58 ("After he was knock[ed] . . . to the ground where the officers cuffed his arms behind his back as [he] lay on his stomach, a jury could reasonably find that he posed only a minimal threat to anyone's safety." (alterations and omissions in Gregory)).

The facts of this case are similar to Drummond. Unlike the force found to be reasonable in Gregory, all of the force at issue in this case occurred after Rucks was already handcuffed with his hands behind his back, and much of it occurred while he was on the ground in a prone position. In addition, the amount of pressure applied by the officers is in dispute. Although the officers testified that they did not use their entire body weight to restrain Rucks, a jury might "find the officers' testimony that they were restrained in their use of force not credible." Santos, 287 F.3d at 852. Likewise, although a jury might agree with Pernell, who testified that he did not think Brogdon and Kidd did anything "inappropriate" to Rucks, and that they were "holding that man down, because if he'd have got up he would have got away from them, point blank, period," a reasonable juror might reach a different conclusion. ECF No. 66-1 at 62. Viewing the evidence in a light most favorable to Plaintiffs, as the Court must at summary judgment, a jury might disbelieve the officers' recollection that Rucks never said he was struggling to breathe and instead believe testimony that Rucks explicitly made such statements. A jury might also find that Rucks

6

was moving around because he was having a hard time breathing, rather than because he was being combative. Unlike in Bel-Montez v. City of Stockton, a case on which Defendants rely, it would be reasonable for a jury to infer that a reasonable officer in Defendants' position would have known that Rucks could not breathe. Case No. 2:10-cv-03149-MCE-EFB, 2017 WL 2633412, at *3 n.2 (E.D. Cal. June 19, 2017) (concluding that, "[a]bsent any other relevant evidence and given [the decedent's] continuous resistance to the officers," it would "not be a reasonable inference" that the decedent's lifting of his head "would alert a reasonable officer that [the decedent] was unable to breathe"). This material disputed fact prevents a conclusion at summary judgment that Defendants' use of force was reasonable.

Defendants also argue that even if the force used by Defendants was unreasonable, there is no dispute that the officers' actions did not cause Rucks's death. The Court disagrees. Plaintiffs present expert testimony from Dr. Daniel Spitz that "restraint asphyxiation" was a contributory cause to Rucks's death. Ex. 61-2 at 6-7.[3] Spitz further opined "that had the police officers not engaged Rakeem Rucks in this type of restraint, there is no evidence to support the conclusion that Mr. Rucks would have died when he did." Id. at 7. At his deposition, Spitz explained that "we do have multiple factors going on here," including methamphetamine usage and an enlarged heart, but that the officers' use of "an active prone restraint . . . impaired [Rucks's] ability to effectively breathe." ECF No. 66-1 at 52. He further opined that the officers' actions "caused compromised breathing which at some point, probably within a couple of minutes prior to him being found unresponsive, actually caused, yes, impaired his ability to breathe to the point where he did become hypoxic. That level of hypoxia combined with the other situations, the other conditions, caused his death." Id. at 52-53. Defendants repeatedly contend that Plaintiffs' expert's opinion is

---

[3] Defendants object to the consideration of Spitz's report on grounds that his "opinions are based on manufactured facts by Plaintiffs, not supported by evidence and are completely speculative." ECF No. 66 at 19. The Court addresses this objection in the body of the order below. Defendants further object to the report because "Plaintiffs' failed to file any timely [declaration] by Spitz swearing to his report under penalty of perjury." Id. Plaintiffs filed such a declaration, ECF No. 65, but did not do so until one day after the deadline for filing their amended opposition. Although Plaintiffs should have filed the declaration with their original opposition, Defendants responded to the merits of Spitz's report in their reply, and the Court finds no prejudice to accepting the late declaration.

7

based on "manufactured facts," e.g., ECF No. 66 at 13-14, but those facts – including how much pressure Defendants applied to Rucks and whether they were able to do so for sustained periods of time – are disputed questions for the jury to decide. Defendants' objections to Spitz's conclusions go to the weight rather than the admissibility of his testimony. Defendants will be free at trial to argue to the jury that they should disbelieve Spitz's opinions, but the Court cannot make such credibility determinations at summary judgment. Anderson, 477 U.S. at 255.

Finally, Defendants argue that they are entitled to qualified immunity because, even if their use of force was excessive, their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Again, the Court disagrees. The qualified immunity doctrine "acknowledge[s] that reasonable mistakes can be made as to the legal constraints on particular police conduct. . . . An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances." Saucier v. Katz, 533 U.S. 194, 205 (2001). An officer is entitled to qualified immunity "[i]f the officer's mistake as to what the law requires is reasonable." Id. In this case, if a jury were to believe the officers' version of events and find that they did not hear Rucks complain of breathing difficulties, that they never pressed their full body weight into Rucks, and that they were applying only whatever pressure they felt was necessary to restrain a person who was resisting arrest and posed a safety risk, then Defendants would be entitled to qualified immunity. However, as discussed above, a jury might reach contrary conclusions under which Defendants' use of force would have been unreasonable. These "unresolved issues of fact are also material to a proper determination of the reasonableness of the officers' belief in the legality of their actions." Espinosa v. City & Cty. of San Francisco, 598 F.3d 528, 532 (9th Cir. 2010). If a reasonable officer would have known that Rucks was having difficulty breathing, or would have concluded that Rucks did not pose a significant safety threat while he was handcuffed in a prone position and was not actively resisting the officers or attempting to free himself, then concluding that the law allowed the continued application of significant pressure to hold Rucks down would have been unreasonable. See Drummond, 343 F.3d at 1058-62; Gregory, 523 F.3d at 1108-09.

8

Disputed facts therefore prevent the grant of qualified immunity at summary judgment.

The three cases cited by Defendants on reply do not change the result of this analysis. Two cases, one of which is unpublished, are from the Sixth Circuit. In one case, the subject of force "had engaged in significant destruction of private property and assaulted" a third party, and he was deemed to "pose[] an immediate threat to himself, the officers, the staff members, and the other residents" of a group home. Cook v. Bastin, 590 F. App'x 523, 530 (6th Cir. 2014). He was also "attempting to free himself" from handcuffs. Id. Similarly, in the second case, the subject had "caused significant property damage, was a threat to the officers and to others, and resisted arrest during an episode of excited delirium." Roell v. Hamilton Cty., 870 F.3d 471, 485 (6th Cir. 2017), reh'g denied (Sept. 21, 2017). The officers also observed that he "was holding objects that could be used as weapons." Id. These facts are materially distinguishable from those that a jury might find in this case. In neither of the Sixth Circuit cases did the individual complain of breathing problems. A jury might also conclude that Rucks had no weapons, did not pose an immediate threat after being handcuffed, and was not trying to free himself.

The third case relied on by Defendants is also distinguishable. In James v. Oakland Police Department, the district court granted qualified immunity on an excessive force claim because "the evidence in the record does not establish a violation of [the plaintiff's] Fourth Amendment rights." No. 13-CV-00011-SI, 2016 WL 3230704, at *9 (N.D. Cal. June 13, 2016). The Court has already determined that a jury might conclude otherwise in this case. In addition, there was no indication that the plaintiff in James complained of breathing difficulties, and the court's description of the plaintiff's injuries focused on potential injuries from the officers' use of a Taser prior to handcuffing, not from the "minor uses of force" used to "take the struggling James to the ground and hold him while handcuffing him, and holding him on the ground until the ambulance arrived." Id. at *7.

### B. Other Claims Against Individual Defendants

Defendants' motion for summary judgment on Plaintiffs' other claims against the individual Defendants rests on their argument that Defendants did not use unreasonable force. The Court has already determined that whether Defendants' use force was reasonable cannot be

9

resolved at summary judgment. The Court therefore also denies summary judgment on Plaintiffs' Fourteenth Amendment claim and state law claims against the individual Defendants.

### C. <u>Monell</u> Claim

Finally, under <u>Monell v. Department of Social Services</u>, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. 658, 694 (1978). Plaintiffs assert that Defendant City of Antioch is liable under a failure to train or ratification theory, but the only evidence they cite regarding their <u>Monell</u> claim is sixteen lines from the deposition transcript of Defendant Brogdon at pages 108 and 109. ECF No. 61 at 26-28. The Court cannot consider this evidence because Plaintiffs failed to present those pages of Brogdon's deposition to the Court. <u>See</u> ECF No. 61-2 at 9-48 (excerpts from Brogdon deposition, not including pages 108 or 109). Moreover, while a municipality may be held liable for an officer's actions based on a ratification theory, "[t]o show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.' . . . [I]t is well-settled that a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval." <u>Christie v. Iopa</u>, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988)). The cited deposition testimony does not even purport to demonstrate who the authorized policymakers were or that they approved the actions by the individual Defendants in this case. Likewise, although Plaintiffs contend that the individual Defendants received inadequate training, they present no evidence on what training the officers did or did not receive, nor do they present any evidence as to how Defendants' training was inadequate or why the City's use of force policy is inadequate. <u>See</u> ECF No. 50-3 at 67-72 (City of Antioch Police Department Policy No. 16: Use of Force). Plaintiffs also fail to present any evidence of a pattern or practice of similar uses of force by City of Antioch police officers. Because Plaintiffs have presented no evidence of an official policy or custom, they have failed to meet their burden of demonstrating a genuine issue of material fact on their <u>Monell</u> claim. Defendants are therefore entitled to summary judgment.

**CONCLUSION**

Defendants' motion for summary judgment is granted in part and denied in part. The motion is granted as to Plaintiffs' Monell claim and denied in all other respects. Evidentiary objections not addressed in this order are denied as moot because the Court did not consider the disputed evidence.

**IT IS SO ORDERED.**

Dated: June 25, 2018

JON S. TIGAR
United States District Judge