

## CAMERON CONSULTING

November 2, 2017

Mr. Noah Blechman
McNamara, Ney, Beatty, Slattery, Borges & Ambacher LLP
3480 Buskirk Avenue, Suite 250
Pleasant Hill, CA 94523
925.939.5330

Re: Rucks v. City of Antioch

Dear Mr. Blechman:

In preparation for my testimony in the above captioned case I have reviewed the following listed materials: Complaint; Incident Report #15-6418; Bates Stamped Documents - APD 1 - 740 including: Video; Photographs; Audio Recording; Interviews; Transcripts of Interviews; Coroner's Report as to Cause of Death; Coroner's Inquest; Crime Lab Report; Deposition Testimony of Mr. L. Pernell, Officer Brogdon, Officer Kidd, Officer Smith, Sergeant Smith, Dr. Josselson & Exhibits, Ms. D. Moore, Ms. B. Mc Instosh, Ms. J. Williams & R.R. (a minor); Sutter Memorial Records; Co.Co. County Fire Department Report; Departmental Regulations; Police Chiefs' Association Co.Co. County - Protocol for Law Enforcement Involved Fatal Incidents, 2014; California Penal Code; California Health and Safety Code; P.O.S.T. Learning Domain #15, #20 & #33 of the Basic Course Unit Guide; Graham v. Connor (109 S. Ct. 1895 (1989)); Forrester v. City of San Diego, 25 F. 3d 804 (9th Cir. 1994)); 2002 U.S. App. LEXIS 12280; 2002 Cal. Daily Op. Service 5523; Daily Journal DAR 7011; Monell v. City of New York Department of Social Services 436 U.S. 658 (1978); City of Canton, Ohio v. Harris 109 S. Ct. 1197 (1989) 105 Cal. Rptr. 748; U.S. v. Dykes 03-3122 (District of Columbia Appeals Court) 5/6/05; Tatum v. CCSF CV02-04785 SBA (9th 4/2/06); Maddox v. City of Los Angeles, 792 F.2d 1408, 1415 (9th Cir. 1986); People v. Howell, 30 C.A. 3d; 105 Cal. Rptr. 748) & Devenpeck v. Alford, 2004 U.S. Lexis 8272; Doerle v. Rutherford, 272 7F.3d 1272, 1283 (2001) and Anderson v. Creighton 483 U.S. 635, 107 S. Ct. (1987). Based on my review of the listed materials and my training and experience as a police officer and supervisor for 16 years; my work as an expert witness on police practices cases for the past 39 years; working as a police physical skills and classroom instructor for 49 years; being a P.O.S.T.; court certified expert on the identification of markings caused by impact weapons and weaponless defense techniques (District and State Courts); P.O.S.T. & S.T.C. instructor trainer in identifying markings caused by impact weapons and weaponless defense techniques; being a member of P.O.S.T.'s subject matter expert committee on Use of Force; member writer of Learning Domain #20 (use of force), #24 (handling disputes/crowd control), #33 (arrest and control), #35 (firearms)

1

#37 (persons with disabilities) for the P.O.S.T. basic academy and subject matter expert question and answer panel member for the P.O.S.T. tele-course on "Controlling Violent Subjects" I & II; I have reached the following opinions and conclusions beyond a reasonable degree of professional certainty:

> The basic peace officer training course is broken down into forty-three (43) Learning Domains. A Learning Domain is a specific functional area of learning for a basic peace officer. Each Learning Domain has a set of objectives that the peace officer trainees must complete. ( Being a member of The Commission on Peace Officers Standards and Training (P.O.S.T.) subject matter expert committee on use of force - member writer of Learning Domain #20 (use of force), #24 (handling disputes/crowd control), #33 (arrest and control), #35 (firearms) & #37 (persons with disabilities) for the P.O.S.T. basic academy)
>
> All peace officers in the state of California must master the forty-three Learning Domains and meet each objective before they can be certified as a peace officer through one of the P.O.S.T. (Commission on Peace Officers Standards and Training) certified training academies. (Being a member of The Commission on Peace Officers Standards and Training (P.O.S.T.) subject matter expert committee on use of force and physical methods of arrest - member writer of Learning Domain #20 (use of force), #24 (handling disputes/crowd control), #33 (arrest and control), #35 (firearms) & #37 (persons with disabilities) for the P.O.S.T. basic academy)
>
> The City of Antioch sends their officers to P.O.S.T. certified police academies which meet and exceed the standards set by P.O.S.T. (My training and experience as a police officer and supervisor for 16 years - my work as an expert witness on police practices cases for the past 39 years - working as a police physical skills and classroom instructor and instructor trainer for 49 years)
>
> On 6/25/15 Officers Brogdon and Kidd were dispatched to 2301 Sycamore Drive Apt. #160 after dispatch received a call that the caller was in Apt. #160 and that there were people outside the apartment that were going to shoot him. (Dispatch call - incident report)
>
> Officers Brogdon and Kidd subsequently learned that Rucks had placed the call and had kicked in the apartment door of Mr. L. Pernell who was the tenant in apartment #160. They met Mr. Pernell in the area of his apartment and he stated that he wanted Rucks prosecuted for his actions of kicking in his door. Pernell took the officers to an apartment where he said that Rucks might be, but he was not there, as they were leaving that apartment someone pointed Rucks out to them on the second landing of the apartment building. (Bates stamped materials - interviews)
>
> The officers called Rucks to come down to their location on the main level of the apartments, which he did. The officers were investigating the kicking in of

Pernell's door and had reasonable suspicion to detain Mr. Rucks. It was reasonable for them to place Rucks in handcuffs at that time. Officer Kidd had a prior contact with Rucks and also knew that he had resisted officers in the past. Rucks offered no resistance to the officers at that time and allowed them to handcuff him. (Bates stamped materials - interviews - depositions)

From their training and experience and Rucks' actions and demeanor they knew that he was under the influence of a controlled substance which gave them probable cause to arrest him and move him to Officer Brogdon's patrol vehicle. (594 PC - 11550 HS - bates stamped materials - interviews - People v. Howell, 30 C.A. 3d; 105 Cal. Rptr. 748) - Devenpeck v. Alford, 2004 U.S. Lexis 8272)

A peace officer may use reasonable force to effect an arrest, to prevent an escape or to overcome resistance. The officer need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested. An officer's use of force is judged under the objectively reasonable standard, would an officer of similar training and experience; given the same information and situation; choose the same course of action. Officers are not required to use the least intrusive degree of force possible, but rather required to use reasonable force. Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue. (835a of the Penal Code - Graham v. Connor (109 S. Ct. 1895 (1989)) - Forrester v. City of San Diego, 25 F. 3d 804 (9th Cir. 1994))

As the officers were walking Rucks through the apartment complex to Officer Brogdon's patrol car, at first he was co-operative, but he suddenly became resistant, by attempting to pull away from Officer Brogdon, he had also not been throughly searched at that time. When he pulled away from Officer Brogdon he became a resistant subject as defined by P.O.S.T., P.O.S.T. defines an actively resistant subject as: Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, verbally, or physically signaling an intention to avoid or prevent being taken into or retained in custody. The force options listed by P.O.S.T. for an actively resistant subject are: Use of personal body weapons to gain advantage over the subject, pain compliance control holds, takedowns and techniques to direct movement or immobilize a subject, use of devices and/or techniques to ultimately gain control of the situation. It was a trained technique, P.O.S.T. approved, departmentally approved, meets the reasonably well train officer standard and a reasonable use of force for Officer Brogdon to attempt to force Mr. Rucks to the ground and for Officer Kidd to use a leg sweep take down to force him to the ground. (My training and experience as a police officer and supervisor for 16 years; my work as an expert witness on police practices cases for the past 39 years; working as a police physical skills and classroom instructor for 49 years; being a P.O.S.T.; being a member of P.O.S.T.'s subject matter expert committee on Use of Force; member writer of Learning Domain #20 (use of force), #24 (handling disputes/

3

crowd control), #33 (arrest and control), #35 (firearms) & #37 (persons with disabilities) - Learning Domain 20, Version 3.2, page 2-6, force options)

The placing of a knee, hand or both on the shoulder of a resistant subject when they are on the ground fighting and resisting officers is a trained technique, P.O.S.T. approved, departmentally approved, meets the reasonably well train officer standard and a reasonable use of force. (My training and experience as a police officer and supervisor for 16 years - my work as an expert witness on police practices cases for the past 39 years - working as a police physical skills and classroom instructor for 49 years - being a P.O.S.T.; being a member of P.O.S.T.'s subject matter expert committee on Use of Force - member writer of Learning Domain #20 (use of force), #24 (handling disputes/crowd control), #33 (arrest and control), #35 (firearms) & #37 (persons with disabilities) - Tatum v. CCSF CV02-04785 SBA (9th 4/2/06) - L.D. 33 - TTS 33 - L.D. 20, page 2-6, force option)

The use of a figure four leg lock is a trained technique, P.O.S.T. approved, departmentally approved, meets the reasonably well train officer standard and a reasonable use of force. The figure four leg lock is used to control a kicking subject's leg. Officer Kidd was being lifted up by Rucks' legs. Officer Kidd was 285 pounds at the time and was having difficulty controlling Rucks' legs. The officers knew from their training and experience that individuals under the influence of certain drugs have a high pain tolerance and seem to be exceptionally strong because they don't have any inhibiters to prevent them from resisting. (My training and experience as a police officer and supervisor for 16 years; my work as an expert witness on police practices cases for the past 39 years - working as a police physical skills and classroom instructor for 49 years; - being a P.O.S.T. - being a member of P.O.S.T.'s subject matter expert committee on Use of Force; - member writer of Learning Domain #20 (use of force), #24 (handling disputes/crowd control), #33 (arrest and control), #35 (firearms) & #37 (persons with disabilities) - L.D. 33 - TTS 33 - L.D. 20, page 2-6, force option)

The use of the "Wrap -safe restraint" is a trained technique, P.O.S.T. approved, departmentally approved, meets the reasonably well train officer standard and a reasonable use of force. The Wrap was not totally applied because Rucks stopped breathing. (My training and experience as a police officer and supervisor for 16 years; my work as an expert witness on police practices cases for the past 39 years - working as a police physical skills and classroom instructor for 49 years; - being a P.O.S.T. - being a member of P.O.S.T.'s subject matter expert committee on Use of Force; - member writer of Learning Domain #20 (use of force), #24 (handling disputes/crowd control), #33 (arrest and control), #35 (firearms) & #37 (persons with disabilities) - L.D. 33 - TTS 33 - L.D. 20, page 2-6, force option)

When Mr. Rucks appeared to stop breathing, Officer Brogdon immediately started CPR which was taken over by fire and paramedics within minutes.

Officer Brogdon's actions of applying CPR were above and beyond his responsibility as defined by the court system. (Tatum v. CCSF CV02-04785 SBA (9th 4/2/06); Maddox v. City of Los Angeles, 792 F.2d 1408, 1415 (9th Cir. 1986))

Learning Domain 37 of the P.O.S.T. Basic Course Unit Guides, Chapter 4, Mental Illness, identifies a variety of mental issues a person may have and some of the symptoms associated with that illness, it also identifies appropriate actions officers should be aware of in dealing with these individuals. These actions are for static situations that are controlled and the individual is contained and not a dynamic and fluid situation when someone is resisting and pulling away from officers. Officers are trained to be aware that people affected by mental illness or drugs can be unpredictable and sometimes violent and that officers should never compromise or jeopardize their own safety or the safety of others when dealing with individuals who display symptoms of a mental illness or being on drugs. Officers are also trained that Title II provisions of the ADA, prohibiting discrimination on the basis of disability by public entities and requiring reasonable accommodations of disabled people's limitations does not apply to an officer's on-the-street responses to a reported disturbance, even if they involve disturbed and disabled persons, prior to the officer's securing the scene and ensuring that there is no threat to human life. Once the scene was secured, and no threat existed, the officer would have a duty to reasonably accommodate the person's disability, but not before. Here, assuming that Mr. Rucks was suffering from a mental illness induced by drugs, the officers would have to stop his resistance before accommodating his mental illness. (Learning Domain 37 - Hainze v. Richards, No. 99-50222, 207 F. 3d 795 (5th Cir. 2000) - my training and experience as a police officer and supervisor for 16 years - my work as an expert witness on police practices cases for the past 39 years - working as a police physical skills and classroom instructor for 49 years)

The 9th Circuit has rejected the notion that there is a, per se rule requiring mentally disabled persons to be treated differently. "We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals." (Doerle v. Rutherford, 272 7 F.3d 1272, 1283 (2001))

There are no visible injuries listed in the medical examiners report or in photographs that are consistent with baton strikes, the taser, kicks or punches. The marks on Rucks forehead, shin and knee are consistent with abrasions caused by having the face and leg on the ground and struggling with the officers. (Court certified expert on the identification of markings caused by impact weapons and weaponless defense techniques (District and State Courts) - P.O.S.T. & S.T.C. instructor trainer in identifying markings caused by impact weapons and weaponless defense techniques)

Attached please find my resume, which outlines my qualifications and publications I have authored; my fee schedule and a listing of the cases I have testified as an expert

5

in for the last four years.

At this time I plan on using comparison photographs as exhibits during my testimony. I also reserve my right to use any other materials supplied to me as exhibits.

I plan on reviewing other materials; if requested; as they become available. Should any of these materials alter my opinions or conclusions I will contact you immediately.

Sincerely:

D.S. Cameron;
Cameron Consulting